SAM ZIMMERMAN v. HOGG & ALLEN, PROFESSIONAL ASSOCIATION, SUCCESSOR TO GREENE, HOGG & ALLEN, PROFESSIONAL ASSOCIATION, AND GLENN L. GREENE, JR.

No. 77

(Filed 26 November 1974)

1. **Rules of Civil Procedure § 56— motion for summary judgment — burden of proof — consideration of evidence**

The party moving for summary judgment has the burden of establishing the absence of any triable issue, and the court in considering the motion carefully scrutinizes the papers of the moving party and, on the whole, regards those of the opposing party with indulgence. G.S. 1A-1, Rule 56.

2. **Rules of Civil Procedure § 56— motion for summary judgment — essentials of proof**

The burden on the party moving for summary judgment may be carried by proving that an essential element of the opposing party's claim is nonexistent or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim; if the moving party meets this burden, the opposing party must either assume the burden of showing that a genuine issue of material fact for trial does exist or provide an excuse for not so doing.

3. **Rules of Civil Procedure § 56— material issue — genuine issue**

An issue is material if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action, or if the resolution of the issue is so essential that the party against whom it is resolved may not prevail; a genuine issue is one which can be maintained by substantial evidence.

4. **Corporations § 7; Principal and Agent § 5— corporate agent — apparent authority**

When a corporate agent acts within the scope of his apparent authority, and a third party has no notice of the limitation on such authority, the corporation will be bound by the acts of the agent.

5. **Principal and Agent § 5— misconduct of third person — burden of bearing loss**

Where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence or by his negligent conduct made it possible for the loss to occur must bear the loss.

6. **Principal and Agent § 5— apparent authority**

Apparent authority is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses, and the determination of the principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had conferred upon his agent.

Zimmerman v. Hogg & Allen

7. **Corporations § 7; Principal and Agent § 5— duty to know authority of agent — general agent — corporate president**

The rule that a person dealing with an agent must know the extent of his authority does not apply when dealing with one who is a general agent, as the president of a corporation; in such case the burden is upon the principal to show that the other party had notice of a restriction upon the power of the general agent.

8. **Attorney and Client § 5; Corporations § 7; Principal and Agent § 5— misappropriation of client's funds by attorney — liability of professional association**

In an action against a professional association of attorneys engaged in the practice of labor law to recover funds given by an officer of a corporate client to the senior member for investment in stock and misappropriated by the senior member, plaintiff's evidence on motion for summary judgment by defendant raised a genuine issue of material fact as to whether the senior member was acting within the scope of his apparent authority and as agent for the professional association in receiving the funds for investment where it tended to show that the charter of the professional association granted it very broad powers, the exercise of which was chiefly in the hands of the senior member, who was also the president and principal stockholder; that while the senior member was on business trips to attend to the legal business of a corporate client, he accepted funds for investment purposes from employees of the corporate client; that these corporate employees were assured that such moneys would be handled through the professional association; that such activities by the senior member had occurred over a period of several years; and that other members of the professional association had knowledge of such dealings, it being reasonable to infer from the evidence that the investment services rendered by the senior member to the employees of the corporate client were for the purpose of obtaining good will of the corporation to insure the continuance of a profitable association between the client and the professional association.

Chief Justice BOBBITT not sitting.

ON appeal pursuant to G.S. 7A-30(2), from the decision of the Court of Appeals, 22 N.C. App. 544, 207 S.E. 2d 267.

Plaintiff, an officer and employee of Holly Farms Poultry Industries, Inc. (hereafter referred to as Holly Farms), sued defendant, Hogg & Allen, Professional Association (P.A.), successor to Greene, Hogg & Allen, P.A. (hereafter referred to as Professional Association) and defendant Glenn L. Greene, Jr., individually (hereafter referred to as Greene) for breach of contract and breach of trust with regard to the handling of a certain stock purchase transaction.

Holly Farms had engaged Professional Association to represent it in labor relations and to act as labor counsel for the

Zimmerman v. Hogg & Allen

corporation. Professional Association had sought to limit its practice of law to this area. The charter of the Association, however, issued under Florida law, contained no such limitation. To the contrary, it granted very broad powers to the entity, as evidenced by the following excerpt from the Charter:

"ARTICLE II — GENERAL NATURE OF
BUSINESS AND POWERS

The general nature of the business to be transacted by this corporation shall be as follows:

(a) To engage in every phase and aspect of the practice of law and to render professional legal services to any and all persons, firms, corporations, and other entities, and to the general public, in the State of Florida and all of [sic] otherwise, throughout the world, unless prohibited by law.

(b) To invest its funds in real estate, mortgages, stocks, bonds or other types of investments, and to own real or personal property necessary for the rendering of the aforesaid professional services.

(c) In general, to do all things and perform all acts necessary and proper for the accomplishment of the aforesaid purposes or necessary or incidental to the achievement of the objectives of the corporation, and to have and exercise all powers of any nature whatsoever permitted or conferred by law upon corporations in general, unless specifically prohibited by the Professional Services Corporation Act of the State of Florida, including and [sic] subsequent amendments thereto;

(d) The foregoing clauses shall be construed both as objects and powers, and it is hereby expressly provided that the foregoing enumeration of special powers shall not be held to limit or restrict in any manner the powers of this corporation."

Defendant Greene, allegedly acting as agent for Professional Association, entered into a contract with plaintiff whereby Greene was to obtain for, and sell, transfer, and deliver to, plaintiff three thousand shares of the common stock of Kentucky Fried Chicken, Inc., for $24,000. When he received the money, Greene wrote the following letter to plaintiff:

"LAW OFFICES
GREENE, HOGG & ALLEN
PROFESSIONAL ASSOCIATION
SUITE 602-607
THE MUTUAL OF OMAHA BUILDING
1201 BRICKELL AVENUE
MIAMI, FLORIDA 33131
May 3, 1971

Mr. Sam Zimmerman
c/o Holly Farms Poultry Industries, Inc.
Monroe, North Carolina

Dear Sam:

This is to acknowledge receipt of your check in the amount of $24,000.00 and also receipt of Mr. Garmon's check in the amount of $3600.00. This will entitle you to 2,000 shares of Kentucky Fried Chicken, and Mr. Garmon will be entitled to 300 shares.

It now appears that the merger between Kentucky Fried Chicken and Heublein is official, and you will receive .53 of Heublein's stock for each share of Kentucky Fried Chicken stock. It will take approximately 90 to 120 days to get the Heublein stock after the merger is formally approved by the SEC.

If you have any questions concerning this matter, please let me know.

Sincerely,
s/ GLENN
Glenn L. Greene, Jr.

GLG:rw"

Although plaintiff demanded delivery of the stock, he never received it, and he demanded delivery of stock or payment of fair market value of the stock, as of the date of merger between Kentucky Fried Chicken and Heublein, which value was $22 per share.

Plaintiff alleged in his second claim for relief that Greene, acting as agent of Professional Association, had received the sums here involved to be held in trust by defendants for the purpose of purchasing Kentucky Fried Chicken stock. He further alleged that defendant Association breached this trust when, through its agent Greene, it disposed of the moneys received and so held in trust in violation of the terms of the trust agreement made by Greene.

The complaint then stated substantially identical allegations against defendant Greene individually.

In addition, the complaint contained additional claims for relief based upon a substantial identical transaction between defendants and one Garmon and alleged that plaintiff had purchased from Garmon all of his right, title, and interest in any chose in action resulting from the breach of contract or the breach of trust.

Defendant Professional Association moved for summary judgment. After considering the affidavits and exhibits submitted on this motion, Judge Rousseau rendered summary judgment in favor of defendant Professional Association. Plaintiff appealed.

On appeal to the Court of Appeals, the judgment of the Superior Court was affirmed, Judge Vaughn dissenting.

*McElwee, Hall and McElwee, by W. H. McElwee and T. V. Adams, for plaintiff-appellant.*

*Hudson, Petree, Stockton, Stockton, and Robinson, by Ralph M. Stockton, Jr., and James H. Kelly, Jr., for defendant-appellee, Hogg and Allen, P.A.*

BRANCH, Justice.

G.S. 1A-1, Rule 56(c), in part, provides:

" . . . The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. . . . "

In instant case the Court considered pleadings, affidavits, and depositions furnished by both parties, and, after determin-

---

**Zimmerman v. Hogg & Allen**

---

ing that there was no genuine issue as to any material fact necessary to determine plaintiff's claim, allowed the motion of defendant Professional Association for summary judgment and dismissed the action as to that defendant.

**[1, 2]** In ruling on a motion for summary judgment, the Court does not resolve issues of fact but goes beyond the pleadings to determine whether there is a genuine issue of material fact. The moving party has the burden of establishing the absence of any triable issue, and the Court in considering the motion carefully scrutinizes the papers of the moving party and, on the whole, regards those of the opposing party with indulgence. This burden may be carried by movant by proving that an essential element of the opposing party's claim is nonexistent or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim. If the moving party meets this burden, the party who opposes the motion for summary judgment must either assume the burden of showing that a genuine issue of material fact for trial does exist or provide an excuse for not so doing. If a genuine issue of material fact does exist, the motion for summary judgment must be denied; the motion may be granted only where there is no such issue and the moving party is entitled to judgment as a matter of law. G.S. 1A-1, Rule 56(e), Rule 56(f); *United States v. Kansas Gas and Electric Co.,* 287 F. 2d 601 (10th Cir.); 6 J. Moore, Moore's Federal Practice § 56.15; *see also* Gordon, *The New Summary Judgment Rule in North Carolina,* 5 Wake Forest Intramural Law Review 87, 94; *William J. Kelly Co. v. Reconstruction Finance Corp.,* 172 F. 2d 865 (1st Cir.); *Singleton v. Stewart,* 280 N.C. 460, 186 S.E. 2d 400; *Kessing. v. Mortgage Corporation,* 278 N.C. 523, 180 S.E. 2d 823.

**[3]** " "The determination of what constitutes a "genuine issue as to any material fact" is often difficult. It has been said that an issue is material if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action, or if the resolution of the issue is so essential that the party against whom it is resolved may not prevail. . . . It has been said that a genuine issue is one which can be maintained by substantial evidence. . . . ' " *McNair v. Boyette,* 282 N.C. 230, 192 S.E. 2d 457.

The question of liability of a professional association of attorneys for investment of a client's funds by an officer or director of the professional association is one of first impression in

this jurisdiction. In fact, we find very little authority even as to a partner's liability in a general partnership engaged in the practice of law. Since plaintiff's claims are based on the premise that defendant Greene was acting as an agent for the professional association at the times complained of, we first look to the general law of agency, particularly the law of apparent authority.

Our analysis of apparent authority of a corporate agent must begin with the recognition that the *power* of an agent to bind his corporate principal is not always coterminous with his *authority* to bind the principal. Dr. Robert E. Lee, in North Carolina Law of Agency and Partnership § 44 (3rd ed.), states:

"The authority of an agent should be carefully distinguished from the power of an agent. The expressions have been used with great carelessness. An act is within the authority of an agent if the agent is privileged to do that act by the principal; that is, if the agent's doing of the act is not a violation of the agent's duty to his principal. An act is within the power of an agent if the agent has the legal ability to bind the principal to a third person thereby, even though the act constitutes a violation of the agent's duty to the principal. The agent always has both a power and an authority, the latter being sometimes identical with, sometimes smaller, but never larger, than the former. . . . "

[4, 5] This Court has recognized this important distinction by stating two salient principles which govern the rights of third parties with regard to corporate entities, which of necessity must act through agents, *to wit:* (1) When a corporate agent acts within the scope of his apparent authority, and the third party has no notice of the limitation on such authority, the corporation will be bound by the acts of the agent, and (2) " '[w]here one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence *or by his negligent conduct made it possible for the loss to occur,* must bear the loss.' " (Emphasis added.) *Railroad v. Lassiter and Co.,* 207 N.C. 408, 177 S.E. 9, quoting *Railroad v. Kitchin,* 91 N.C. 39.

[6] The rights and liabilities which exist between a principal and a third party dealing with that principal's agent may be governed by the apparent scope of the agent's authority, which

is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses; however, the determination of a principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances, conferred upon his agent. *Warehouse Co. v. Bank,* 216 N.C. 246, 4 S.E. 2d 863; *Railroad v. Smitherman,* 178 N.C. 595, 101 S.E. 208.

A distinguished commentator on the law of corporations has stated the rationale behind the doctrine of apparent authority:

"The primary object of a corporation in employing an agent is that he shall be enabled to accomplish the purposes of the agency, and other persons are invited to deal with the agent with that understanding. Whether or not the agent is acting within the apparent scope of his authority must be determined by what the principal has done, not by the unratified acts and declarations of the agent. If the facts and circumstances of the particular case reveal that an ordinarily prudent man would have been put on notice that one with whom he was dealing was not acting within the apparent scope of his authority, the principal is not bound under well-settled principles of agency law. When one deals with a special agent of a corporation, or an agent who has only special authority to act for his principal, it devolves upon the person dealing with such agent to acquaint himself with the extent of the agent's authority. However, it seems that the corporation will be bound, as to third persons, by all acts of its agent which are within the apparent scope of the latter's authority without regard to whether or not the agent is a general or a special one. And persons dealing with a known agent of a corporation have a right to assume, in the absence of information to the contrary, that his agency is general. The name by which a corporate officer is designated is not at all necessarily determinative of his authority."

2 W. Fletcher, Cyclopedia of the Law of Private Corporations § 434 at 307-308 (Perm. Ed.).

This general rule of law has been applied by this Court in numerous cases. *See, e.g., Research Corporation v. Hardware*

*Co.,* 263 N.C. 718, 140 S.E. 2d 416; *Moore v. WOOW, Inc.,* 253 N.C. 1, 116 S.E. 2d 186; *Sears Roebuck and Co. v. Banking Co.,* 191 N.C. 500, 132 S.E. 468. The fact situations of these cases, however, provide little guidance in instant case since each case turns largely upon the unique facts presented. In other words, the law of apparent authority is easy to state but difficult to apply.

Where one deals with the president of a corporation, however, the establishment of apparent authority is less difficult. Recently, in *Burlington Industries v. Foil,* 284 N.C. 740, 202 S.E. 2d 591, we summarized and reaffirmed the reach and scope of presidential authority:

> "This Court has frequently held that the president of a corporation by the very nature of his position is the head and general agent of the corporation, and accordingly he may act for the corporation in the business in which the corporation is engaged. [Citations omitted.] The authority of the president to act for the corporation is limited to those matters that are incidental to the business in which the corporation is engaged; that is, to matters that are within the corporation's ordinary course of business. [Citations omitted.]

> "Generally, when some act is undertaken by the president that relates to material matters that are outside the corporation's ordinary course of business, in the absence of express authorization for such act by the board of directors, the corporation is not bound. [Citations omitted.] As stated in *Brinson v. Supply Co.,* [219 N.C. 498, 14 S.E. 2d 505], '[f]or a contract executed by the officer of a corporation to be binding on the corporation it must appear that (1) it was incidental to the business of the corporation; or (2) it was expressly authorized; and (3) it was properly executed.' And in *Tuttle v. Building Corp.,* [228 N.C. 507, 46 S.E. 2d 313], it is stated:

>> 'In the absence of a charter or bylaw provision to the contrary, the president of the corporation is the general manager of its corporate affairs. [Citations omitted.] His contracts made in the name of the company in its general course of business and within the apparent scope of his authority are ordinarily enforceable. [Citations omitted.] But, usually, he has no

> power to bind the corporation by contract in material
> matters without express authority from the directors
> or stockholders. [Citations omitted.]' "

[7] Further, plaintiff is aided by a venerable presumption
in our corporate law " . . . that a person dealing with an agent
must know the extent of his authority does not apply when deal-
ing with one who is a general agent, as the president of a
corporation. In such case the burden is upon the principal to
show that the other party had notice of a restriction upon the
power of the general agent. . . . " *Bank v. Oil Co.*, 157 N.C. 302,
73 S.E. 93.

As Russell Robinson has so aptly stated in his North Car-
olina Corporation Law § 13-8 at 271 (2d ed. 1974) : ". . . The
point is primarily a matter of basic agency law. As particularly
applied in the corporate context, it would mean, for example,
that persons dealing with the president or any other corporate
officer can in good faith assume that he is empowered to exer-
cise the customary functions of his office, unless notice is
given to the contrary. . . . "

By its very nature, a professional association more nearly
resembles the closely held corporation than a public corporation.
Particularly within the context of a law practice, it is highly
unlikely that busy attorneys will resort to all of the formalities
of the corporate entity in making decisions concerning firm
business and in performing the myriad small duties demanded
of them. The model of the closely held corporation becomes
even stronger in a situation where, as in instant case, one per-
son acts as chief executive officer and also holds a majority of
the shares in the corporation. In such a situation, the actions
of the corporate entity more nearly resemble the conduct of a
partnership than of a corporation. Professor F. Hodge O'Neal
in his work, Close Corporations Vol. 2, § 8.05, has noted this
similarity in the management of a closely held corporation and
a partnership:

> "Although the same broad principles of corporation
> and agency law determine the powers of officers in both
> close and publicly held corporations, the factual differ-
> ences in the patterns of operation of the two kinds of cor-
> porations lead to wide disparities in the powers the courts
> actually recognize in corporate officers. In a close corpora-
> tion, ownership and management normally coalesce; and

Zimmerman v. Hogg & Allen

the participants often conduct their enterprise internally much as if it were a partnership. The courts have seldom articulated a difference in the rules governing officers' powers in close and publicly held corporations; yet they appear in fact to have often cut through the technical legal form of close corporations to reach the results that would be reached if the enterprises were conducted as partnerships. In other words, the courts frequently, and perhaps usually, recognize in officers of a close corporation the same powers that are possessed by partners in a firm under the general rule of partnership law which makes each partner an agent of the firm for the purposes of its business and empowers each partner to bind the firm by acts apparently carried on to further the usual business of the partnership.

"The courts have rather consistently held officers in a close corporation to possess powers to bind the corporation under circumstances which would make a similar holding questionable in a publicly held corporation. . . . In view of the typical patterns of operation in close corporations, holdings of this kind can usually be reconciled with traditional doctrine by viewing an officer whose powers are questioned as in fact a general manager of the company or as having a general manager's broad powers, or by applying principles of ratification or of authority or apparent authority by acquiescence. In any event, only in rare instances have courts failed to hold a close corporation bound by *inter vivos* contracts entered into by any officer of the corporation."

All parties appear to agree that the crucial question on this appeal is whether the receipt of funds for investment purposes falls within the scope of the practice of law, and therefore within the scope of the apparent authority of Greene.

We are guided to some degree by a very few cases which have considered the liability of a *partner* when another member of the firm accepts funds for investment and then misappropriates the funds. We find two cases in this country which stand for the general proposition that the acceptance of money for investment in undesignated securities is not generally within the orderly scope of a partnership organized for the practice of law, and therefore another partner will not be charged with liability for misconduct of the person accepting the money for investment unless there be knowledge of, consent to, or ratifi-

cation of the transaction by the other partners. *Rouse v. Pollard*, 130 N.J. Eq. 204, 21 A. 2d 801; *Riley v. Larocque,* 163 Misc. 423, 297 N.Y.S. 756.

In *Blackmon v. Hale,* 1 Cal. 3d 548, 83 Cal. Rptr. 194, 463 P. 2d 418, a client entrusted funds to an attorney for the purpose of clearing a title on real estate and purchasing a note secured by a mortgage on the real estate. The attorney deposited the funds in a partnership trust account during the existence of the partnership and subsequently misappropriated the funds after the partnership was dissolved. The court held that the receipt of this money was within the ordinary course of legal business for which the other partners were accountable. In reaching its decision, the Supreme Court of California, in part, stated:

　　" 'Every partner is an agent of the partnership for the purpose of its business, and the act of every partner . . . for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership.' [Citation omitted.] The apparent scope of the partnership business depends primarily on the conduct of the partnership and its partners and what they cause third persons to believe about the authority of the partners. Ostensible agency or acts within the scope of the partnership business are presumed 'where the business done by the supposed agent, so far as open to the observation of third parties, is consistent with the existence of an agency, and where, as to the transaction in question, the third party was justified in believing that an agency existed.' [Citations omitted.] The partnership will be relieved from liability for the wrongs of its partners acting individually when the third person has knowledge of the fact that he is dealing with the partner in his individual capacity. [Citations omitted.]"

*Cf. Smith v. Travelers Indemnity Co.,* 343 F. Supp. 605 (M. D. N. C.), and *Douglas Reservoirs Water Users Ass'n. v. Maurer & Garst,* 398 P. 2d 74 (Wyo.), each of which declined to impose liability upon a partner because of misapplication of funds received, where the investment was isolated and *clearly* unrelated to the practice of law.

Because of the paucity of American case law on the question before us for decision, we briefly discuss pertinent English authority.

*Willett v. Chambers, Cowp.* pt. 2 814, 98 Eng. Rep. 1377, considered the question of liability of partners for misappropriation of funds received for investment by another partner. There the Court allowed recovery from the other partners on the ground that it was a customary and usual practice for attorneys to receive and lend money so as to obtain profit from the fees and charges collected for drawing the legal instruments.

Similarly, the Court held one partner liable for misappropriation of funds received by the other partners for investment on a mortgage in *Eager v. Barnes,* 31 Beav. 579, 54 Eng. Rep. 1263. There the Court, *inter alia,* stated:

> "The usual course of a solicitor's business, when there are partners in it, is for each partner to have his own clients, and separately to transact their business. Where, however, as in this instance, money is received by one member of a partnership for the express purpose of a special investment, and it is paid by him into the partnership account instead of being properly invested, and when the proceeds of that account are received by the firm, it is impossible to say that one partner is not liable for the misconduct of the other in the misapplication of the funds."

*See also* Annotation—Investment of Clients' Funds—Firm Liability, 136 A.L.R. 1110.

In *Central Realty, Inc. v. Hillman's Equipment Inc.,* 253 Ind. 48, 246 N.E. 2d 383, the Court, in the same procedural context as instant case, considered the authority of an officer of a corporation to bind the corporation. There the vice-president of the corporation made statements to the effect that his actions which were in suit were not within the scope of his authority as agent of the corporation. There was other evidence upon which the third party, who dealt with the officer, might have formed a belief that the officer was acting within the scope of his authority as agent of the corporation.

The Court, holding that there was a genuine issue of material fact as to whether the officer was acting as an individual or as agent of the corporation, reversed the action of the trial judge, who had allowed defendant corporation's motion for summary judgment.

In order to apply the above-stated principles of law to the facts of this case, it becomes necessary to summarize the evidence presented at the hearing on the motion for summary

judgment by movant. In support of its motion for summary judgment, movant Professional Association, in summary, presented the following evidence:

(1.) The sworn statement of defendant Glenn L. Greene, Jr., who averred that all matters in suit were "purely personal matters between myself and plaintiff. Other than that, that is all I am going to say about that." He further stated that all correspondence with plaintiff was signed by him personally, not as an attorney, and there was no agreement concerning the matter in suit between plaintiff and Professional Association.

(2.) Affidavits of Jesse H. Hogg and W. Reynolds Allen to the effect that neither the Professional Association or either of the affiants had engaged in the practice of receiving or holding money or securities for investment or profit. Affiants each stated that the law practice of the Professional Association was limited to the practice of labor law.

(3.) The deposition of Amie Ferro, personal secretary to Greene, who stated that all of the practice of the Professional Association was labor-oriented and that she knew of nothing which indicated that any attorney in the Professional Association was aware that Greene was receiving money for investment. Neither was she aware of any file or transaction indicating that any member of the Professional Association had ever represented Sam Zimmerman, Frank Rhodes, or Pruitt Garmon. She knew that Greene was selling stock to other people, but she did not know that he was receiving funds for the purpose of buying stock. She further stated that Greene handled all the finances of the firm and that no one else saw any mail until it was called to his attention. In fact, no one in the firm ever went into the "Big Chief's" office.

(4.) The deposition of Robert Louis Norton, an associate in the Professional Association, who averred that he invested money through Greene in a Kentucky Fried Chicken transaction upon the express understanding that he should not tell other members of the Professional Association about it. He did recall having a conversation at a breakfast meeting concerning this stock with Frank Rhodes.

At this point, in our opinion, movant's evidence that Greene was not acting as the agent of the Professional Association within the scope of his authority at the times complained

of carried the burden placed upon it by Rule 56 (c) by showing the absence of one of the essential elements of plaintiff's claim.

Plaintiff, in order to carry the burden thereby imposed upon him to show that a material issue of fact did exist, offered the following evidence:

(1.) Affidavit of Bonnie Rhodes, in which she averred that she was the personnel director of Holly Farms and in that capacity had dealt with defendants. She stated that the letter which embodied the contract in suit was typed on the same letterhead and was signed in the same manner as letters received from Greene concerning legal matters. She further averred that Greene made all decisions involving legal matters for Holly Farms and that she had personally discussed the Kentucky Fried Chicken transactions with other employees of the Professional Association who were aware of the transaction.

(2.) Affidavit of plaintiff Sam Zimmerman, who stated that he was operations manager of Holly Farms and that to his knowledge Greene, the senior member of the Professional Association, completely controlled it, made all decisions concerning fees, and handled the bulk of Holly Farms' legal work; that in the past Greene had advised him concerning personal legal matters, particularly as to investments in a beer franchise, domestic difficulties, and the making of a will; that he had previously delivered to Greene $12,000 to invest, which had been returned together with a substantial profit; that he requested Greene to handle the Kentucky Fried Chicken transaction through the firm and Greene told him it would be so handled; and that he had discussed the Kentucky Fried Chicken transaction with other members and employees of the Professional Association in the presence of Greene. He further stated that one of the other directors and stockholders in the Professional Association, Hogg, had also volunteered to furnish legal services to him in a domestic matter. Affiant had actually discussed the transaction in suit with Hogg at a breakfast meeting.

(3.) The deposition of Frank E. Rhodes, Director of the North Carolina Division of Holly Farms, who stated that he had known Greene for several years and that prior to the transaction in suit, Greene had invested $25,000 for him for which Greene received a commission, and that Greene was supposed to get a commission for the transaction involving Kentucky Fried Chicken stock. In the latter transaction Greene had

agreed to obtain 3,000 shares of Kentucky Fried Chicken for the sum of $36,000. He forwarded a check to Greene in the amount of $36,000, and he had been reimbursed by two checks in the amount of $750 each. He further stated that he had talked with Norton, an associate in the Professional Association, about the Kentucky Fried Chicken transaction, but he could not say whether it was before or after he entered into the agreement with Greene. By an affidavit Rhodes also stated that before he delivered the money for investment, Greene told him that he could get the Kentucky Fried Chicken stock at a reduced price because a close friend who was having domestic difficulties wanted to sell to prevent his wife from getting additional stock.

The checks for the purchase of stock were made to Greene personally.

[8]   It is reasonable to infer from this evidence that the investment services rendered by Greene to the employees of Holly Farms might have been for the purpose of obtaining the good will of the corporation to insure the continuance of a profitable association between the corporate client and the Professional Association. This inference would suggest a striking analogy to the practice of receiving funds for investment in order to generate fees for drawing legal instruments, a practice which has been recognized by both our courts and the English courts as being within the scope of the usual practice of law.

The evidence in this case, when construed most indulgently in plaintiff's favor, as Rule 56 requires, tends to show that the powers granted to the Professional Association by its charter were very broad powers, the exercise of which was principally in the hands of Greene; that defendant Greene, while he was on business trips to attend to the legal business of Holly Farms, accepted funds for investment purposes from employees of the corporate client; that these corporate employees were assured that such moneys would be handled through the Professional Association; that such activities by Greene, the president and principal stockholder of the Professional Association, had occurred over a period of several years; and that other employees of the Professional Association had knowledge of such dealings.

Under these particular circumstances, we are of the opinion that plaintiff's evidence was sufficient to justify a reasonable and prudent belief by plaintiff Sam Zimmerman that the

Professional Association had conferred authority upon Greene to receive the funds from him for investment while acting as its agent. Thus plaintiff's evidence raised a genuine material issue for trial as to whether Greene acted within the scope of his authority and as agent for the Professional Association at the times complained of. The issue so raised was material because without establishing agency, plaintiff could not recover, and the issue was genuine because it could be supported by substantial evidence.

· Plaintiff met the burden imposed upon him by Rule 56(c), and, therefore, the trial judge erred by rendering summary judgment in favor of Hogg & Allen, P.A., successor to Greene, Hogg & Allen, P.A.

The decision of the Court of Appeals is reversed, and this cause is remanded to that Court with direction that the cause be remanded to the Superior Court of Wilkes County for proceedings consistent with this opinion.

Reversed and remanded.

Chief Justice BOBBITT not sitting.