OLA BLANTON LUCAS, Widow of LEONARD M. LUCAS, Deceased Employee v. LI'L GENERAL STORES, a Division of General Host Corporation, Employer; and LIBERTY MUTUAL INSURANCE COMPANY, Carrier

No. 14

(Filed 29 January 1976)

1. **Master and Servant § 49— workmen's compensation — claimant as employee**

   To be entitled to maintain a proceeding for compensation under the Workmen's Compensation Act the claimant must have been an employee of the alleged employer at the time of his injury, or, in case of a claim for death benefits, the deceased must have been such an employee when injured; thus, the existence of the employer-employee relationship at the time of the accident is a jurisdictional fact, and the finding of a jurisdictional fact by the Industrial Commission is not conclusive upon appeal even though there be evidence in the record to support such finding.

2. **Master and Servant § 49— workmen's compensation — dismissed employee rehired without authority**

     Decedent was not an "employee" within the meaning of the Workmen's Compensation Act when he was shot and killed during a robbery while he was in defendant's store near the cash register where decedent had been dismissed as an employee of defendant because he sold beer to a minor, decedent's wife succeeded him as Acting Manager of the store, decedent's wife contended that defendant's District Manager told her that decedent could work in the store, but that decedent would be paid through the wife's check, the District Manager had no authority to allow decedent to work in the store, and both decedent and decedent's wife knew that the District Manager was acting in excess of his authority when he permitted decedent to work in the store. G.S. 97-2(2).

ON *certiorari* to the Court of Appeals to review its decision reported in 25 N.C. App. 190, 212 S.E. 2d 525, reversing an award in favor of the claimant by the North Carolina Industrial Commission.

On 26 April 1973, in the course of a robbery of a store in Gastonia owned and operated by Li'l General Stores, Leonard M. Lucas was shot by one of the robbers while in the store near the cash register. As a result of the wound he died the following day. The Industrial Commission found that, at the time of the shooting, he was an employee of Li'l General Stores and that the shooting was an accident arising out of and in the course of his employment. The sole question on this appeal is whether such employment relationship existed at the time of the shooting.

### Undisputed Facts

Li'l General Stores owned and operated five small convenience stores in the Gastonia area and similar stores elsewhere. These were kept open 16 hours a day for seven days a week. From time to time, employees were shifted by the District Manager from one store to another. Due to the size and nature of these stores, they were frequently operated by a single employee, called the Manager. George Shaver, the District Manager, supervised the several stores and assisted the store managers from time to time as needed. Prior to 27 February 1973, Leonard M. Lucas was employed as a store manager. His wife, the claimant, was also an employee of the company, working at times at the Highland Street store and at times at the Carolina Avenue store. On 27 February 1973, Leonard M. Lucas was dismissed from his employment by Li'l General

Stores for the reason that he had sold beer to a minor in violation of the laws of North Carolina. By reason of this violation of the law, the license of Li'l General Stores to sell beer was suspended.

### THE CLAIMANT'S EVIDENCE

At the time of the robbery, she was employed as Manager at the Carolina Avenue store. George Shaver, the District Manager, was her superior. In the week prior to the shooting, Mrs. Lucas had been working at the Highland Street store. On Sunday prior to the shooting, Shaver gave her the keys to the Carolina Avenue store and told her to open it on Monday morning. On Monday she and her husband went to and opened the store. They worked there until Thursday, 26 April, the day of the shooting. On that date she was not feeling well and about 8:45 p.m. went into a back office room, lay down and went to sleep, leaving her husband out in front at the cash register. While she slept the robbery and shooting occurred.

When Shaver transferred her to the Carolina Avenue store on the preceding Sunday, he had said with reference to Mr. Lucas, "He can't work over there but four days a week." She asked, "What about Mr. Pepper and them?" Pepper was the Division Manager of the company, the superior of Shaver. Shaver replied, "Well, what they don't know won't hurt them." With further reference to Mr. Lucas, Shaver said, "I'll have to run his pay through your check."

Prior to the husband's discharge, Mrs. Lucas had worked at the Carolina Avenue store, of which Mr. Lucas was then manager. She was just "helping out" and does not know whether she got paid or not. During the week of the robbery, Shaver was in the Carolina Avenue store practically every day and Mr. Lucas was present, frequently "running the cash register and making the books out and making the deposits at the bank." Mr. Shaver had told Mr. Lucas to keep the books. On one day during the week of the robbery and shooting, Mrs. Lucas, with Shaver's knowledge, went to Columbia, South Carolina, for medical treatment, leaving her husband in charge of the Carolina Avenue store. Shaver told her her husband could stay there and run the store until she returned.

Out of the check received by her from Li'l General Stores, Mrs. Lucas paid her husband at the rate of $2.00 an hour, her

check from the company being for two shifts per day, a total of 16 hours per day. Her husband helped her put up stock, made out the books, made out the bank deposits, carried the deposits to the bank and was the only one who had the combination to the safe. Shaver had handed the combination of the safe to Mr. Lucas when he assigned Mrs. Lucas to manage the Carolina Avenue store on the Monday preceding the shooting on Thursday.

While Mrs. Lucas was working at the Highland Street store, her sister, Mrs. Robinson, helped her on parts of four days. Some of this assistance by the sister was pursuant to the direction of Mr. Shaver and for that work the sister's pay was "run through" Mrs. Lucas' check. Other work so done by the sister, at Mrs. Lucas' request, was paid for by Mrs. Lucas out of her own pay from the company. Mrs. Lucas, herself, did not work for Li'l General stores prior to the time her husband was discharged.

Mr. Shaver told Mrs. Lucas to let Mr. Lucas "run the cash register as long as the ABC law didn't catch him." Mrs. Lucas "worked from seven in the morning till * * * eleven at night, 16 hours a day, two shifts" at the store on Highland Street before her transfer back to the Carolina Avenue store. Mrs. Lucas never kept the books at the Carolina Avenue store. Shaver came to the store and saw Mr. Lucas working. He did not forbid him to do so or tell Mrs. Lucas to "get him off the premises."

Mrs. McDaid, a witness for the claimant, testified that a few minutes before Mr. Lucas was shot, she and her son stopped at the Carolina Avenue store, the son went into the store and purchased a bottled drink from Mr. Lucas. On other occasions in the same week, she observed Mr. Lucas at the cash register, Mrs. Lucas being also in the store on some of these occasions.

Other witnesses for the claimant testified that they had observed both Mr. Lucas and Mrs. Lucas at the Carolina Avenue store. Some of these observed Mr. Lucas putting up stock and others were waited on by Mr. Lucas as customers of the store.

### THE DEFENDANTS' EVIDENCE

George Shaver, District Manager of the Li'l General Stores in the Gastonia area, testified that Mrs. Lucas, or anyone else,

could work 16 hours a day at the Carolina Avenue store because there was no real work in running this store, it didn't require two people at any one time and all one had to do was "just set there." Mr. Lucas was not employed to work at the store by Shaver, or by anyone acting with Shaver's authority, at the time of the shooting. He was discharged on 27 February 1973 for selling alcoholic beverages to a minor. The personnel transaction sheet on the company form, signed by Shaver, stated Mr. Lucas was "discharged for misconduct by violating Company rules." This paper was signed by Shaver and by his superior, Jacobson, Division Manager of the company. Mrs. Lucas was then acting as assistant manager of that store (Highland Street store) and, upon the discharge of Mr. Lucas, she was put in charge of that store.

Thereafter, Shaver told Mr. Lucas on several occasions that he was not allowed in the company stores, this being against company policy since he was no longer employed by the company. Shaver was usually at the store under his supervision every day and he saw Mr. Lucas in the store "a number of times." Shaver told Mrs. Lucas that Mr. Lucas was not allowed in there and never mentioned anything to her about allowing Mr. Lucas to "make up the books," since Shaver, himself, kept the books from data supplied to him by Mrs. Lucas. Shaver "cleared" the cash register and kept the books himself at that store because Mrs. Lucas was not capable of doing so.

Mrs. Lucas had no authority to hire Mr. Lucas or anyone else to stay in the store with her, or to be her assistant. Shaver, himself, did not have any authority to authorize Mrs. Lucas to do so. To have Mr. Lucas around the store "could have endangered the continuation of the beer license" of the store, in the opinion of Shaver. While Mrs. Lucas was working at the Highland Street store, Shaver spoke to her a few times about Mr. Lucas "coming about the premises." He never authorized her to continue to let her husband "come about the premises and do some work." Shaver knew nothing of any plan for Mrs. Lucas to use part of her pay check to compensate Mr. Lucas for work done by him at the store. He had no conversation with Mrs. Lucas concerning any payment to her sister in this manner. When Mrs. Lucas wasn't working, Shaver knew "who was in her place" and whenever she was not at the store he was "or someone else would be there." Shaver at no time made any arrangements for Mr. Lucas to return to work at the store and did not at any time agree to his working about the store to

assist Mrs. Lucas. She asked Shaver if she could bring her husband to the store to help her and his response was that Mr. Lucas was not allowed in the store to work for fear that if he was allowed to do so, the company would lose its beer license for all five of its stores.

There were frequent occasions when Shaver operated the Carolina Avenue store with just one employee for as much as two or three weeks. Anyone can come into the store who wants to, and if Mr. Lucas was in the store during the week of the shooting, he was "just hanging around" and talking to his wife. At no time after Mr. Lucas was discharged did Shaver see Mr. Lucas carrying out any duties of an employee in any of the company's stores by waiting on customers, ringing up sales, putting up stock, keeping books or otherwise. None of these things was done by Mr. Lucas with Shaver's authority. Mrs. Lucas had no authority to make any contract of employment with her husband. Shaver gave the safe combination at the Carolina Avenue store to Mrs. Lucas, saying, "Probably Mr. Lucas still knows the combination; I don't know if he does or not."

At the time of his testimony, Shaver had already given Li'l General Stores notice of his intent to terminate his own employment by the company, so his continued employment did not depend upon his testimony in this proceeding.

Myron E. Jacobson, Assistant Division Manager of Li'l General Stores, testified that Shaver, his subordinate, did not have any authority to put Mr. Lucas back on the payroll of the company after his discharge, or to authorize Mrs. Lucas to do so, and never discussed this with Jacobson. Mrs. Lucas had no such authority.

Susan Hambrick testified that when Mr. Lucas was discharged Shaver employed her to operate the Highland Street store for one shift, Mrs. Lucas handling the other shift, and instructed her not to have Mr. Lucas in the store. On one occasion, when Mrs. Hambrick had to go to see her doctor, Shaver told her to have Mrs. Lucas come in and work. Mrs. Lucas asked if Shaver would object if Mr. Lucas came to the store and stayed with her. Thereupon, Mrs. Hambrick telephoned Shaver, who replied that Mr. Lucas could not do so. She gave that message to Mrs. Lucas. On occasion, when no one else was available, Mrs. Hambrick has worked consecutive shifts, 16 hours a day, seven days a week, without help.

Bob Craig Gibson, Manager of the Highland Street store when Mrs. Lucas was working there, overheard a conversation between Shaver and Mrs. Lucas with reference to Mrs. Lucas' allowing her husband to work. Shaver then told Mrs. Lucas to keep Mr. Lucas out of the store because it was against company policy for him to be in it. Mr. Gibson told Mr. Lucas the same thing and Mr. Lucas knew it. On occasion, Mr. Gibson has worked 16 hours a day for seven days a week. The book work takes him about 30 minutes a day. He can do it and also wait on customers.

*Basil L. Whitener and Anne M. Lamm for plaintiff.*

*Mullen, Holland & Harrell, P.A., by James Mullen for defendants.*

LAKE, Justice.

[1]  It is well settled that to be entitled to maintain a proceeding for compensation under the Workmen's Compensation Act the claimant must have been an employee of the alleged employer at the time of his injury, or, in case of a claim for death benefits, the deceased must have been such an employee when injured. *Hicks v. Guilford County,* 267 N.C. 364, 148 S.E. 2d 240; *Askew v. Tire Co.,* 264 N.C. 168, 141 S.E. 2d 280; *Richards v. Nationwide Homes,* 263 N.C. 295, 139 S.E. 2d 645; *Hayes v. Elon College,* 224 N.C. 11, 29 S.E. 2d 137. Otherwise, the Act simply has no application to the claim. Thus, the existence of the employer-employee relationship at the time of the accident is a jurisdictional fact. Notwithstanding G.S. 97-86, the finding of a jurisdictional fact by the Industrial Commission is not conclusive upon appeal even though there be evidence in the record to support such finding. The reviewing court has the right, and the duty, to make its own independent findings of such jurisdictional facts from its consideration of all the evidence in the record. *Hicks v. Guilford County, supra; Askew v. Tire Co., supra; Richards v. Nationwide Homes, supra.* The claimant has the burden of proof that the employer-employee relation existed at the time the injury by accident occurred.

The Workmen's Compensation Act, in G.S. 97-2(2), defines the term "employee," as used in the Act, as follows:

"The term 'employee' means every person engaged in an employment under any appointment or contract of hire

or apprenticeship, express or implied, oral or written, including aliens, and also minors, whether lawfully or unlawfully employed, but excluding persons whose employment is both casual and not in the course of trade, business, profession or occupation of his employer * * *."

This statutory definition adds nothing to the common law meaning of the term. *Hayes v. Elon College, supra.* As Chief Justice Stacy, speaking for the Court, said in *Hollowell v. Department of Conservation and Development*, 206 N.C. 206, 173 S.E. 603, "An employee is one who works for another for wages or salary, and the right to demand pay for his services from his employer would seem to be essential to his right to receive compensation under the Workmen's Compensation Act, in case of injury sustained by accident arising out of and in the course of his employment." Whether this relationship existed at the time of the injury by accident is to be determined by the application of the ordinary common law tests. *Richards v. Nationwide Homes, supra; Scott v. Lumber Co.*, 232 N.C. 162, 59 S.E. 2d 425; *Hollowell v. Department of Conservation and Development, supra.*

[2] In the present case, the Court of Appeals said: "We find * * * that decedent was not an 'employee' within the meaning of the Workmen's Compensation Act. There being no employer-employee relationship, the Industrial Commission could not take cognizance of the claim. The order granting plaintiff's claim is reversed." Having reviewed the entire record, we concur in this finding and conclusion of the Court of Appeals.

It is clear from the evidence that had Mr. Lucas not been injured in the robbery, he would have had no enforceable claim against Li'l General Stores for compensation for any services rendered by him at the Carolina Avenue store during the week of the robbery. "One who voluntarily assists a servant at the latter's request does not, as a general rule, become the servant of the master so as to impose upon the latter, the duties and liabilities of a master toward such volunteer, or so as to render the master liable to third persons injured by such volunteer's acts or negligence, while rendering such assistance." *Reaves v. Power Co.*, 206 N.C. 523, 174 S.E. 413.

It is undisputed that Mr. Lucas was discharged by Li'l General Stores because he sold beer to a minor in violation of the law of North Carolina and of the policy of Li'l General

Stores. Having been employed as Manager of the store at which he was shot, he was familiar with the organization of the company and the limits of the authority of his wife who had succeeded him as Acting Manager of this store.

There is evidence that Mr. Lucas was frequently in the store after his discharge and, while there, did various things to assist his wife in her work. This is entirely consistent with the desire of an unemployed husband to be in the company of his wife at her place of employment, such association not being calculated to disturb her in her work, and to assist her in the performance of her duties, especially where, as here, the wife would otherwise be working alone at night in a location attractive to armed robbers. Even if the claimant's evidence be viewed in the light most favorable to her contention and the evidence for the company be disregarded, the claimant's evidence fails to show the existence of the employer-employee relation between the company and Mr. Lucas. At most, it would support a finding that the claimant, the District Manager, and Mr. Lucas were in collusion to deceive the company with reference to the fact of Mr. Lucas' working at the store.

The testimony of the District Manager is that he knew nothing about this and did not authorize it or consent thereto. His testimony is corroborated by the testimony of other witnesses. At the time of his testimony, he had already voluntarily given notice of his own resignation from the employment of the company, so his own employment would not have been placed in jeopardy by his admission that he knew of and acquiesced in the alleged employment of Mr. Lucas prior to and at the time of the injury.

The evidence is clear and uncontradicted that the District Manager had no actual authority to re-employ Mr. Lucas after the latter's discharge, or to authorize Mrs. Lucas, the Acting Manager of the local store, to do so. It is true that a principal, who has clothed his agent with apparent authority to contract in behalf of the principal, is bound by a contract made by such agent, within the scope of such apparent authority, with a third person who dealt with the agent in good faith, in the exercise of reasonable prudence and without notice of limitations placed by the principal upon the agent's authority. *Zimmerman v. Hogg and Allen,* 286 N.C. 24, 209 S.E. 2d 795; *Research Corp. v. Hardware Co.,* 263 N.C. 718, 140 S.E. 2d 416; *Powell v. Lumber Co.,* 168 N.C. 632, 84 S.E. 1032. This rule, however,

has no application where, as here, the third party, when dealing with the agent, knew or in the exercise of reasonable care should have known that the agent was not authorized to enter into the contract. *Zimmerman v. Hogg and Allen, supra; Commercial Solvents v. Johnson,* 235 N.C. 237, 69 S.E. 2d 716; *R. R. v. Smitherman,* 178 N.C. 595, 101 S.E. 208.

In discussing the liability of a principal upon a contract entered into by an agent within the latter's apparent authority, Justice Walker, speaking for the Court in *R. R. v. Smitherman, supra,* said:

> "The apparent authority, so far as third persons are concerned, is the real authority, and when a third person has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation to inquire into the agent's actual authority. The authority must, however, have been actually apparent to the third person, who, in order to avail himself of rights thereunder, must have dealt with the agent in reliance thereon, in good faith, and in the exercise of reasonable prudence, in which case the principal will be bound by acts of the agent performed in the usual and customary mode of doing such business, although he may have acted in violation of private instructions, for such acts are within the apparent scope of his authority. An agent cannot, however, enlarge the actual authority of his own acts without some measure of assent or acquiescence on the part of his principal, whose rights and liabilities as to third persons are not affected by any apparent authority which his agent has conferred upon himself simply by his own representations, express or implied."

In *Texas Co. v. Stone,* 232 N.C. 489, 61 S.E. 2d 348, Chief Justice Stacy, speaking for the Court, said, "One dealing with an agent or representative with known limited authority can acquire no rights against the principal when the agent or representative acts beyond his authority or exceeds the apparent scope thereof." In the Restatement of the Law of Agency, 2d, § 166, it is said, "A person with notice of a limitation of an agent's authority cannot subject the principal to liability upon a transaction with the agent if he should know that the agent is acting improperly." Comment (a) upon this section of the Restatement reads: "If a person has information which would lead a reasonable man to believe that the agent is violating the

orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability. Any substantial departure by the agent from the usual methods of conducting business is ordinarily sufficient warning of lack of authorization." In 2A CJS, Agency, § 166, it is said, "Any apparent authority that might otherwise exist vanishes in the presence of the third person's knowledge, actual or constructive, of what the agent is, and what he is not empowered to do for his principal."

Taking the claimant's evidence to be true and disregarding the contrary testimony of the District Manager, it shows that Mrs. Lucas, herself, had, at least, substantial doubt concerning the authority of the District Manager to authorize the re-employment of her husband, for she testified that she asked the District Manager, "Well, what about Mr. Pepper and them [his superiors]?" To this, she testified, the District Manager replied, "What they don't know won't hurt them." According to her testimony, denied by the District Manager, their plan was to "run his [Mr. Lucas'] pay through [Mrs. Lucas'] check." That is, the plan was designed to conceal from the company's officials the fact that Mr. Lucas was working at the store and to prepare the payroll so as to make it appear that Mrs. Lucas alone was working, she to divide the pay check with him. This circumstance alone is sufficient to put both Mrs. Lucas and Mr. Lucas upon notice that the District Manager was acting in excess of his authority when he authorized Mrs. Lucas to re-employ her husband, assuming that he did so.

Under these circumstances, we think the conclusion is inescapable that there was no contract between Li'l General Stores and Mr. Lucas re-establishing the relation of employer and employee between them. Thus, he was not the employee of Li'l General Stores at the time of his injury and the Industrial Commission should have dismissed the claim.

Affirmed.