MAXINE DOCKERY, WIDOW, REX DOCKERY, DECEASED, EMPLOYEE, PLAINTIFF v. ROBERT B. McMILLAN, D/B/A McMILLAN HOMES, INCORPORATED, EMPLOYER; NON-INSURED, AND/OR RANDY DOCKERY, EMPLOYER; NON-INSURED, DEFENDANTS

No. 8610IC970

(Filed 5 May 1987)

**Master and Servant § 49 — workers' compensation — father in son's employ — father as employee**

Plaintiff's husband was an employee within the meaning of the Workers' Compensation Act at the time he fell from a roof to his death, though the employer-employee relationship in this case was somewhat unusual or informal because it was between father and son, where the evidence tended to show that for a number of years, when he was able and when he was needed, the deceased provided valuable roofing skills and services for his son, and in exchange for these services, which furthered his business, the son would provide his father with three to four hundred dollars worth of necessities per month.

APPEAL by plaintiff from Opinion and Award of the Industrial Commission entered 27 May 1986. Heard in the Court of Appeals 15 January 1987.

*Don H. Bumgardner for plaintiff appellant.*

*Essex, Richards & Morris by B. Garrison Ballenger, Jr., for defendant appellee Robert B. McMillan, d/b/a McMillan Homes, Inc.*

COZORT, Judge.

Plaintiff appeals the Commission's Opinion and Award, filed 27 May 1986, adopting Deputy Commissioner Sellers' 27 January 1986 Opinion and Award, finding that Rex Dockery was not an employee within the meaning of N.C.G.S. § 97-2(2) but was a "mere volunteer." Commissioner Charles A. Clay dissented. We reverse.

Robert G. McMillan, president of McMillan Homes, Inc., as general contractor for the construction of a residence at 4105 Columbine Circle in Charlotte, North Carolina, subcontracted with roofing contractor Randy Dockery in the middle of July of 1983 to put a roof on the house under construction. When Robert McMillan contracted with Randy Dockery, Dockery did not give McMillan any certificate of insurance as to workers' compensation, and McMillan does not remember whether he asked Dockery for such a certificate.

Randy Dockery learned the roofing business from his father, Rex Dockery. Due to problems with his back Rex Dockery stopped working full time in the roofing business in 1975, and he went on disability in September 1975. In 1975 or 1976 Randy Dockery formed his own roofing business. After Rex Dockery stopped roofing full time and went on disability he would "work" for his son, Randy, on a part-time basis. On 23 July 1983, a Saturday, Rex Dockery went with Jeff Roberson and Curt Dockery, Rex's son and Randy's brother, to roof the house on Columbine Circle. Jeff Roberson and Curt Dockery were Randy Dockery's only full-time employees at the Columbine Circle house. While working on the roof, Rex Dockery fell off the roof and to his death on a concrete patio.

In finding and concluding that Rex Dockery was not an "employee" within the meaning of the Workers' Compensation Act, and thus leaving the Commission without jurisdiction in this case, the Commission made three numbered findings of fact:

1. The deceased, Rex Dockery, was in partnership with his brother for a number of years working as a roofing subcontractor until back difficulties, which qualified him for social security disability benefits since September of 1975, caused him to dissolve the partnership. Thereafter, on an occasional basis the deceased assisted his son, defendant Randy Dockery, who had also become involved in the roofing business. There existed between the deceased and defendant Randy Dockery no written contract for hire and, in fact, there was no implied contract for hire for the reason that the deceased "came and went as he pleased." Further, he was not subject to being fired by defendant Randy Dockery, nor did defendant Randy Dockery have a right of control over what

the deceased did or when he might do what he did. Any monies which defendant Randy Dockery paid the deceased was not based on the value of services rendered, but was rather gratuitous based on whether the deceased was in need of money for medicine, for shoes or for a house payment.

2. Defendant Robert G. McMillan d/b/a McMillan Homes, Inc., is a general contractor in the business of constructing residential dwellings. On one such dwelling the roofing work had been subcontracted to defendant Randy Dockery. On 23 July 1983 the deceased fell to his death from the roof of this house.

3. At the time of his death, the deceased was not an employee of defendant Randy Dockery who was a subcontractor for the general contractor, defendant Robert McMillan d/b/a McMillan Homes, Inc., but was rather a mere volunteer who occasionally received monies unrelated to the values of services rendered.

In his dissenting opinion Commissioner Clay stated:

I believe the majority errs in dismissing this claim for lack of jurisdiction. Contrary to the Deputy Commissioner's conclusion, an employer-employee relationship clearly existed between the deceased worker and his son, a sub-contractor. The fact that this relationship was some-what [sic] unusual or informal because it was between father and son does not, in my opinion, mean that the relationship did not exist within the meaning of the Act.

The decision affirmed by the majority finds that money paid to the father by the son was "not based on value of services rendered, but was rather gratuitous based on whether the deceased was in need of money for medicine, for shoes or for a house payment." These are among the basic things, of course, that most people work to earn money for.

Certainly the $300.00 to $400.00 a month the son paid the father before the latter was killed in a fall on a roofing job was of substantial if not great benefit to the son from the standpoint of furthering the son's business. The son testified that after he took over the business, his father priced roofing and did other things the son didn't know how to do. This is

evidence that the father did indeed perform valuable services in his job and more than earned the $300.00 to $400.00 a month he was paid for his work.

We agree with Commissioner Clay.

N.C.G.S. § 97-19 holds a general contractor, in this case defendant McMillan, who fails to require a subcontractor to obtain from the Industrial Commission a certificate of compliance with N.C.G.S. § 97-93, liable to a subcontractor's employees for compensation under the Workers' Compensation Act to the same extent the subcontractor would be liable if the subcontractor were subject to the Act, irrespective of the number of employees the subcontractor employs.

An injured person, however, is entitled to compensation under the Act only if he was an employee of the alleged employer at the time of the accident. *Askew v. Leonard Tire Co.*, 264 N.C. 168, 141 S.E. 2d 280 (1965). Since the Act applies only in an employer-employee relationship, the question of whether the relationship existed at the time of the accident is jurisdictional. *Carter v. Frank Shelton, Inc.*, 62 N.C. App. 378, 303 S.E. 2d 184 (1983), *disc. rev. denied*, 310 N.C. 476, 312 S.E. 2d 883 (1984). Therefore,

[n]otwithstanding G.S. 97-86, the finding of a jurisdictional fact by the Industrial Commission is not conclusive upon appeal even though there be evidence in the record to support such finding. *The reviewing court has the right, and the duty, to make its own independent findings of such jurisdictional facts from its consideration of all the evidence in the record.*

*Lucas v. Li'L General Stores*, 289 N.C. 212, 218, 221 S.E. 2d 257, 261 (1976) (emphasis added). Thus, our task is to examine the whole record and make our own determination of whether Rex Dockery was an employee, within the meaning of the Act, at the time he fell to his death. The claimant has the burden of proof that the employer-employee relationship existed at the time the injury by accident occurred. *Id.*

N.C.G.S. § 97-2(2) defines an employee as "every person engaged in an employment under . . . [a] contract of hire . . ., express or implied, oral or written, . . . whether lawfully or un-

lawfully employed, but excluding persons whose employment is both casual and not in the course of the trade, business, profession or occupation of his employer . . . ." This statutory definition adds nothing to the common law meaning of the term, and whether an employer-employee relationship existed is to be determined by the application of ordinary common law tests. *Lucas v. Li'L General Stores*, 289 N.C. 212, 221 S.E. 2d 257. The relationship of employer-employee "is essentially contractual in its nature, and is to be determined by the rules governing the establishment of contracts, express or implied." *Hollowell v. North Carolina Department of Conservation and Development*, 206 N.C. 206, 208, 173 S.E. 603, 604 (1934). "An employee is one who works for another for wages or salary, and the right to demand pay for his services from his employer would seem to be essential to his right to receive compensation under the Workmen's Compensation Act, in case of injury sustained by accident arising out of and in the course of the employment." *Id.* at 210, 173 S.E. at 605.

In essence, what we must determine is whether at the time of the accident resulting in Rex Dockery's death there existed a contract of hire between Randy Dockery and his father, Rex. For the reasons stated herein, we hold there was an implied oral contract of hire, and the Commission erred in finding Rex Dockery was not an employee and by thus dismissing the claim for lack of jurisdiction.

With respect to the question of an employer-employee relationship between Randy Dockery and Rex Dockery, Randy Dockery, who learned the roofing business from his father, testified on direct examination to the following:

During the summer of 1983 Rex was employed with him as a troubleshooter on a full-time basis. Randy did not know how to price a roofing job and his father did that for him. As far as getting his father on a roofing job, however, they did not get him on the job that often, for Rex would come when he felt like coming. His father's time on the job varied depending upon how his father, who was drawing social security disability, felt or what work Randy had for him to do. As pay or compensation for coming and helping with the actual job site, Randy would get him anything he needed as far as cars, car insurance, a house payment, and the like. This compensation amounted to three to four hundred dollars per month.

On direct examination, Randy Dockery further testified that on the date of the accident he had two full-time employees, Jeff Roberson and Randy's brother Curt.

On cross-examination Randy Dockery testified that when he was single and worked for his father, Rex Dockery paid him like Randy later paid him, by giving him spending money and seeing "to it that [he] didn't need for anything." After Randy got married, however, his father paid Randy just like Randy pays his other roofers, by the square.

Randy further testified on cross-examination that normally he would have himself and two other workers on a jobsite. For a seven, twelve pitch roof he paid the other two workers seven or eight dollars per square. As to how it was decided who would go work on a job, just whoever wanted to go went. Randy testified that "if they don't want to go you're not going to get them to." Randy further testified that he had "a hundred people work for [him] off and on. They would work maybe one day and then never see them again and maybe work one day one week and three months later come in a [sic] work another day or something." From time to time Randy would fire his brother Curt but then he would put him back to work the next day.

On cross-examination Randy acknowledged that he could not have hired or fired his father. He testified that his father worked when he felt like it:

> Like in cold weather, or rainy weather, a lot of weather his back gave him a lot of problems and he didn't like to get out. Like I said, dad was always an independent type anyway. He done what he wanted to.

In response to defense counsel's question concerning whether Randy told his father what to do on the job, Randy testified:

> I really didn't know how to tell him what to do. If there was something I wanted done and said anything to him about it he would see to it it got done, but you just didn't tell him what to do.

While on cross-examination Randy acknowledged that if at all possible whether his father worked for him or not he would have tried to take care of him, his father's working for him "had a lot to do with taking care of [him]."

Maxine Dockery, Rex Dockery's widow, testified that after her husband became disabled, he continued to go up on roofs. His doctor had told him that he could work if he was feeling all right but not to do any climbing if his back was giving him trouble. According to Mrs. Dockery, her husband followed his doctor's advice; he knew when he was able to work and when he wasn't. Rex Dockery only worked for Randy.

With respect to what income Rex brought home, Mrs. Dockery testified that whatever they needed that they could not afford out of their disability checks, Randy provided for them. This averaged one hundred to one hundred twenty-five dollars per week. They never reported this on their income tax because someone at H & R Block told her that as long as Randy was paying taxes on it, they did not have to. Finally, Mrs. Dockery testified that "Randy could not have afforded to do the things that he actually done [for Rex] had Rex not have done some of the things he done for [Randy] either."

While the testimony may at first blush appear conflicting as to a contract of hire, we believe the testimony shows that there was an implied oral contract of hire between Randy Dockery and his father Rex. That Randy did not pay his father in money does not lessen the employer-employee relationship for "[t]he element of payment, to satisfy the requirement of a contract of hire, need not be in money, but may be in anything of value." 1C Larson's Workmen's Compensation Law, § 47.43(a) (1986). The casual nature with which Rex Dockery worked, which the evidence shows was primarily due to his back injury, does not detract from job status as an employee, for under N.C.G.S. § 97-2(2) a casual employee is not excluded from coverage under the Act unless his employment is *not* in the course of the trade, business, profession or occupation of his employer.

While Randy Dockery testified that he could not have hired or fired his father, we do not believe this testimony, in the context of Randy Dockery's whole testimony, makes Rex a mere volunteer. Due to the nature in which Randy ran his business, his employees worked when they wanted to. Randy testified that you could not get them to work if they didn't want to and that people would work one day one week, disappear, and then not show up to work again until three months later.

That Randy did not tell his father what to do likewise does not make his father a mere volunteer. Rex was far more experienced in the roofing business than Randy. The import of Randy's testimony is that, while you just didn't go and order his father, Rex, around, he knew how to get him (Rex) to do what he wanted him to, that is, what needed to be done:

> I really didn't know how to tell him what to do. If there was something I wanted done and said anything to him about it he would see to it it got done, but you just didn't tell him what to do.

An employer-employee relationship is not negated because the employer uses subtle, indirect means to obtain the desired kindly services from the older, more experienced employee.

We agree with Commissioner Clay that the fact that the employer-employee relationship in this case was somewhat unusual or informal because it was between son and father does not mean the relationship did not exist under the Act. The evidence shows that for a number of years when he was able, and when Randy Dockery needed him, Rex Dockery provided valuable roofing skills and services for his son. In exchange for these services, which furthered his business, Randy Dockery would provide his father with three to four hundred dollars worth of necessities per month. The evidence shows that without Rex Dockery's skills and services Randy Dockery would not have been able to afford to provide the three to four hundred dollars worth of necessities per month, even though apart from their business relationship, Randy, as Rex's son, may have wanted to help out his father. We hold that there existed an implied oral contract of hire between employer-son Randy Dockery and employee-father Rex Dockery.

The Opinion and Award of the Commission is reversed and remanded for proceedings consistent with this opinion.

Reversed and remanded.

Judges MARTIN and PARKER concur.