Inland Am. Winston Hotels, Inc. v. Winston, 2010 NCBC 19.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

INLAND AMERICAN WINSTON HOTELS,
INC.,

               Plaintiff,

    v.

ROBERT W. WINSTON, III,
KENNETH R. CROCKETT,
WINSTON HOSPITALITY, INC.,
WILLIAM W. BUNCH, III and
BROWN & BUNCH, PLLC,

               Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 021786

**ORDER & OPINION**

{1}    THIS MATTER is before the Court on Defendants William W. Bunch, III and Brown & Bunch, PLLC's Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. After considering the briefs submitted, other submissions of counsel, and oral argument, the court concludes that Defendants William W. Bunch III and Brown & Bunch, PLLC's Motion for Summary Judgment should be GRANTED.

> *Moore & Van Allen, PLLC by Scott M. Tyler and Karin M. McGinnis and DLA Piper, LLP by Jeffrey D. Herschman and Melissa R. Roth for Plaintiff Inland American Winston Hotels, Inc.*

> *Cranfill Sumner & Hartzog, LLP by Richard Boyette for Defendants William W. Bunch, III and Brown & Bunch, PLLC.*

Tennille, Judge.

## I.

## PROCEDURAL BACKGROUND

{2} This action was filed in Wake County on December 12, 2008. The matter was designated a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated December 22, 2008 and subsequently assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Special Superior Court Judge for Complex Business Cases dated December 22, 2008.

{3} By order dated May 5, 2009, this action was consolidated with a related case, *Crockett Capital Corp. v. Inland Am. Winston Hotels, Inc.*, No. 08 CVS 000691 (N.C. Super. Ct. filed Jan. 16, 2008), for discovery purposes only. Defendants William W. Bunch, III ("Mr. Bunch" or "Bunch") and Brown & Bunch, PLLC are not parties in the related case. In this action, Plaintiff filed suit against Defendants Kenneth R. Crockett and Robert W. Winston for breach of contract and usurpation of corporate opportunity, against Defendant Winston Hospitality, Inc. for tortious interference with prospective advantage, and against Defendants Bunch and Brown & Bunch, PLLC for legal malpractice, breach of fiduciary duty, and tortious interference with prospective advantage.[1]

{4} Defendants Bunch and Brown & Bunch, PLLC filed a Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure on June 16, 2010. Plaintiff filed a responsive brief on July 19, 2010. Defendants Bunch and Brown & Bunch, PLLC filed a reply brief on August 2, 2010. The Court heard oral arguments on the Motion on September 23, 2010. This Order and Opinion only addresses the Bunch and Brown & Bunch, PLLC Motion.

---

[1] No independent claims are asserted against the law firm other than those based upon the actions of Mr. Bunch. References to the claims against Mr. Bunch in this Order and Opinion also apply to the claims against Brown & Bunch, PLLC.

## II.

## FACTUAL BACKGROUND

### A.

### THE PARTIES

{5} Plaintiff Inland American Winston Hotels, Inc. ("Inland") is a corporation organized under the laws of the state of Delaware, with its principal office and place of business in Oak Brook, Illinois. Inland is the successor by merger to Winston Hotels, Inc. ("Winston Hotels"), a North Carolina corporation. The merger became effective on July 1, 2007 when Inland acquired all of the capital stock of Winston Hotels. (Defendants William W. Bunch, III and Brown & Bunch, PLLC's Br. in Supp. of Mot. for Summ. J. ("Defs.' Summ. J. Br.") 3.) On that date Inland also became the general partner of Winn Limited Partnership ("Winn LP"), a North Carolina Limited Partnership previously owned by Winston Hotels. (Mem. of Law in Opp. to the Mot. for Summ. J. Filed by Defs. William W. Bunch, III and Brown & Bunch, PLLC ("Pl.'s Resp. Br.") 3; Dep. of Kenneth R. Crockett ("Crockett Dep.") 302:17−303:1.)

{6} Defendant Bunch is an attorney duly licensed to practice law in the state of North Carolina and at all material times has been a member of Brown & Bunch, PLLC. Mr. Bunch is a real estate transactional lawyer and a founding partner of Brown & Bunch, PLLC.

{7} Brown & Bunch, PLLC is a professional limited liability company organized under the laws of the state of North Carolina and engaged in the practice of law in this state, with offices in Wake and Orange Counties.

{8} Defendant Kenneth R. Crockett ("Mr. Crockett") resides and/or regularly conducts business in Wake County, North Carolina.

{9} Defendant Robert W. Winston, III ("Mr. Winston") resides and/or regularly conducts business in Wake County, North Carolina.

{10}   Winston Hospitality, Inc. ("Winston Hospitality") is a corporation organized under the laws of the state of North Carolina, with its principal place of business in Raleigh, North Carolina.  At all times relevant to this lawsuit, Messrs. Crockett and Winston have been officers of Winston Hospitality, each owning an equity interest therein.

B.

## LEGAL MALPRACTICE, BREACH OF FIDUCIARY DUTY, TORTIOUS INTERFERENCE CLAIMS

{11}   The claims against Mr. Bunch and Brown & Bunch, PLLC arise out of a proposed development project in Durham County near the Research Triangle Park called the "RTP Westin."  The RTP Westin is one of thirteen potential developments contemplated by an agreement between Inland, Winn LP, and Crockett Capital Corporation ("Crockett Capital")[2], which was signed on or about July 30, 2007 and made effective July 1, 2007.  (Defs.' Summ. J. Br. 2, Ex. 26: Agreement Regarding Development Projects ("Master Agreement"); Pl.'s Resp. Br. 4.)

{12}   Prior to July 1, 2007, Winston Hotels was engaged in the business of acquiring, developing and constructing hotels.  (Compl. ¶ 9.)  At that time, Mr. Crockett served as Winston Hotels' Executive Vice President and Chief Development Officer, and Mr. Winston served as its Chief Executive Officer.  (Defs.' Summ. J. Br. 3.)  Mr. Crockett had been working to acquire the RTP Westin site since early 2007.  (Crockett Dep. 300:7–11.)  On July 1, 2007, Inland acquired all the capital stock of Winston Hotels.  (Defs.' Summ. J. Br. 3.)

{13}   From 1994 until the merger with Inland, Mr. Bunch served as legal counsel to Winston Hotels and its related entities, including Winn LP.  (Dep. of William W. Bunch, III ("Bunch Dep.") 6:22–5; Pl.'s Resp. Br. 1.)  Mr.

---

[2] Crockett Capital is a North Carolina corporation formed on July 11, 2007.  Messrs. Crockett and Winston each own a 50% share of the business.  (Pl.'s Resp. Br. 3 n.1.)

Crockett was one of Mr. Bunch's primary contacts in connection with his representation of Winston Hotels. (Bunch Dep. 7:1–4.)

{14}   As part of the acquisition of Winston Hotels, Inland acquired the ownership of hotel properties then under construction and the right to develop other properties, including the RTP Weston, which "may be suitable for development as hotel projects . . . ." (Master Agreement, Recital A.) These properties were identified as "Pipeline Properties" and listed in Exhibit B of the Master Agreement. (Master Agreement, Ex. B.) After the merger, Inland continued to engage in the business of acquiring, developing and constructing hotels. (Compl. ¶ 9.)

{15}   In conjunction with the merger, Inland, Winn LP, and Crockett Capital entered into the Master Agreement, pursuant to which Crockett Capital would use its "expertise in the development, construction, and management of hotel properties" to perform various development services for Inland. (Master Agreement, Recital B.) Crockett Capital was to provide Inland with development proposals for each of the thirteen proposed projects. (Pl.'s Resp. Br. 4–5.)

{16}   If Inland agreed to a final proposed development plan for a particular property in the pipeline, the parties would pursue the project further by negotiating and entering into a succession of preset contractual agreements to develop it. (Master Agreement ¶¶ 3–4.) If Inland rejected a particular property, then Crockett Capital could develop it on its own or with a third party, provided Crockett Capital paid Inland the acquisition costs Inland incurred for that property. (Master Agreement ¶ 5.) Inland would transfer its rights in any such property to Crockett Capital or its assignee and would execute all documentation reasonably necessary to accomplish the transfer. (Master Agreement ¶ 5.)

{17}   In June 2007, Mr. Bunch understood from Messrs. Crockett and Winston that Winston Hotels was in merger talks with Inland's parent, and that as a result of a pending merger, a joint venture was to be formed

between the surviving entity (Inland) and various entities owned by Messrs. Crockett and Winston. (Bunch Dep. 24:2–19.) Mr. Crockett advised Mr. Bunch that after the merger, he and Mr. Winston would be "in essence, the development arm" under the joint venture, and that Mr. Bunch would deal with Mr. Crockett in the same way as he did before the merger. (Bunch Dep. 89:18–25, 90:1–5.) It would be "business as usual" with respect to Mr. Bunch's work on the developments. (Bunch Dep. 89:18–25, 90:1–5.)

{18} As set forth in the Master Agreement and acknowledged by Inland's representative, John Brown, Mr. Crockett was to research and evaluate the Pipeline Properties. (Dep. of John Brown ("Brown Dep.") 618:14–621:11.) He was to perform all predevelopment work with regard to the Pipeline Properties, including: conducting market studies; evaluating sites; negotiating land contracts (including the RTP Westin contract); and hiring vendors and lawyers (including Mr. Bunch). (Brown Dep. 618–621.) He also had the authority to hire and to deal with architects and engineers for those properties. (Brown Dep. 619:23–620:6.)

{19} The negotiations leading to the execution of the Master Agreement at times were contentious. For example, on June 28, 2007, Mr. Crockett sent an email to Mr. Bunch about the ongoing negotiations in which he stated that Inland had not been treating him very well and was reneging on prior commitments. (Pl.'s Resp. Br., Ex. 6: Email from Kenneth Crockett to William Bunch (June 28, 2007, 22:01 EDT).) Mr. Crockett indicated that he might reassess the situation the following week. (Pl.'s Resp. Br., Ex. 6: Email from Kenneth Crockett to William Bunch (June 28, 2007, 22:01 EDT).)

{20} After sending the June 28, 2007 email, Mr. Crockett spoke via telephone to Inland's Chairman, Dan Goodwin. (Crockett Dep. 310:23–311:9.) Mr. Crockett believed that Mr. Goodwin had assured him that Inland intended to go forward with the Agreement. (Crockett Dep. 310:23–311:9.) Mr. Crockett informed Mr. Bunch of these assurances in early July, prior to the execution of the RTP Westin contract on July 11th, and Mr. Bunch

understood at that time that the parties wanted to "do as many deals" as they could.  (Bunch Dep. 85:4–87:5.)

{21}  In June 2007, Mr. Bunch was working with Mr. Crockett to finalize the purchase contract for the RTP Westin site.  (Defs.' Summ. J. Br. 5.)  Mr. Crockett was the point of contact for Mr. Bunch with regard to the RTP Westin contract negotiations.  (Defs.' Summ. J. Br. 5.)  Gregory Sanchez, the seller's representative, had been in ongoing negotiations with Mr. Crockett to finalize the RTP Westin contract.  (Dep. of Gregory Sanchez ("Sanchez Dep.") 32:10–23, 33:23–34:4, 35:19–36:20.)  Prior to his departure for a family vacation in June 2007, Mr. Crockett left a signed copy of the purchase contract for the RTP Westin site with his secretary and instructed Mr. Bunch to release the signature page upon confirmation that Mr. Sanchez had obtained his clients' consent to the final terms.  (Defs.' Summ. J. Br., Ex. 4; Sanchez Dep. 38:3–39:17; Crockett Dep. 300:1–304:2.)  Mr. Crockett signed the purchase contract in his capacity as an officer of Winston Hotels, which was at the time the sole general partner of Winn LP.  (Bunch Dep. 82:25–83:1.)  Although the contract for the sale of the RTP Westin site had not been executed as of July 1, 2007 (the day Inland acquired all rights to Winston Hotels' assets), drafts, all of which named Winston Hotels or Winn LP as the purchaser, had been prepared and circulated.  (Answer of Defs. Robert W. Winston, III, Kenneth R. Crockett, and Winston Hospitality, Inc. ("Westin Answer") ¶ 16; Crockett Dep. 300:1–304:2; Bunch Dep. 80–81.)

{22}  As of July 1, 2007, the parties to the RTP Westin contract had not reached agreement on all of its terms.  (Defs.' Summ. J. Br. 5.)  Mr. Sanchez was putting pressure on Mr. Crockett to execute the contract, because Mr. Sanchez was under pressure to present it to the seller's investment committee contemporaneously with the lease for a proposed office building that would be adjacent to the RTP Westin.  (Defs.' Summ. J. Br. 5.)  Mr. Sanchez gave Mr. Crockett an ultimatum: if the contract terms could not be imminently finalized, he would take the RTP Westin opportunity to another

qualified hotel developer with whom he had a longstanding business relationship. (Sanchez Dep. 53:17–58:11; Bunch Dep. 131:13–132:15) Mr. Bunch was aware that Mr. Sanchez was pushing Mr. Crockett to close the deal. He also was aware of Mr. Sanchez's threat to present the RTP Westin opportunity another qualified developer. (Bunch Dep. 131:13–132:15.)

{23} With the merger between Inland and Winston Hotels concluded, neither Mr. Crockett nor Mr. Winston was an officer or an employee of the surviving entity. (Defs.' Summ. J. Br. 6; Pl.'s Resp. Br. 7.) Neither party had the authority to sign a contract on behalf of Winston Hotels or Inland. Yet, Mr. Crockett's involvement in procuring the RTP Westin project for the joint venture was essential for Inland and Crockett Capital to move forward with the business opportunity. Mr. Sanchez was under a deadline, and without Mr. Crockett's participation, he would have been inclined to recommend selling the property to another developer with whom he had a previous relationship rather than to Inland, an organization lead by unknowns. (Sanchez Dep. 69:25–70:17.) The other developer was a competitor to Winston Hotels and Inland.

{24} Mr. Crockett had the contract for the RTP Westin site put in the name of Winston Hospitality, a Winston-Crockett entity. (Defs.' Summ. J. Br., Ex. 8: Email from Kenneth Crockett to William Bunch (July 11, 2007, 14:05 EDT); Bunch Dep. 126:7–12, 131:1–7.) Mr. Crockett sent Mr. Bunch a contract signed by Mr. Winston on behalf of Winston Hospitality on July 12, 2007. (Bunch Dep. 144:20–3; Tr. of Hr'g 97, *Inland Am. Winston Hotels, Inc. v. Winston*, No. 08 CVS 21786 (N.C. Super. Ct.) (argued Sep. 23, 2010); Compl. ¶ 21; Westin Answer ¶ 21.) It was executed by the seller on July 19, 2007. (Compl. ¶ 21; Westin Answer ¶ 21.)

{25} Mr. Crockett explained the reason for the name change in a July 11, 2007 email to Mr. Bunch, which stated,

> Bill: You will see that, in my discussions with Greg Sanchez, we have changed the purchasing entity to Winston Hospitality for

signature by Bob Winston.  The change is necessary to maintain momentum and timeliness in pursuit of this transaction.  Among other things, Greg needs to present a signed contract for his investment committee tomorrow.  *Bob and I fully intend to develop this property under the terms of our joint venture arrangement being negotiated with Inland.*  The assignment provisions within the purchase agreement will allow us to form the [joint venture] with Inland without further approvals from seller.  Ken.

(Defs.' Summ. J. Br., Ex. 8: Email from Kenneth Crockett to William Bunch (July 11, 2007, 14:05 EDT) (emphasis added).)

{26}   As of July 11, 2007, Mr. Bunch understood that Mr. Crockett, Mr. Winston, and Inland had reached an agreement for the development of the Pipeline Properties, the terms of which were being finalized in the Master Agreement.  (Bunch Dep. 85:4–86:4, 86:23–87:5, 88:7–11, 93:25–94:8, 109:8–17.)  Mr. Crockett told Mr. Bunch in July 2007 that it did not matter which entity ultimately entered into contracts and vendor relationships because Mr. Crockett and Mr. Winston were pursuing deals for the joint venture and because the Master Agreement allowed Inland's pursuit costs to be "trued up."  (Bunch Dep. 22:20–23:6.)  The goal was to get the property under contract, then proceed in accordance with the joint venture.  (Bunch Dep. 110:20–5.)

{27}   Mr. Bunch understood that although Winston Hospitality was named in the contract to purchase the RTP Westin, Messrs. Crockett and Winston intended to assign the contract rights to the joint venture with Inland and negotiated an assignment provision permitting them to do so.  (Defs.' Summ. J. Br. 7, Ex. 8.)  Mr. Bunch made Petula Prolix Development Company, the seller of the RTP Westin site, aware of this intent in a letter dated September 13, 2007.  (Defs.' Summ. J. Br., Ex. 11.)  He explained that

the proposed insured under the Title Commitment is WINN Limited Partnership . . . ("WINN"), whose sole general partner is [Inland] . . . , with WINN or a joint venture entity among WINN and Purchaser[, Winston Hospitality,] being the intended

assignee of Purchaser as contemplated by Section 19 of the Contract.

(Defs.' Summ. J. Br., Ex. 11.)

{28} It is undisputed that the Master Agreement was signed on July 30, 2010 and made retroactive to July 1, 2010, thus ratifying Mr. Crockett's actions on behalf of the joint venture during July.

{29} On August 21, 2007, Crockett Capital tendered to Inland an investment package to develop the RTP Westin. (Reply of William W. Bunch, III and Brown & Bunch, PLLC in Supp. of Mot. for Summ. J. 3.) Ultimately, however, the RTP Westin site never was assigned to Inland. Instead, it was sold to a third party. (Pl.'s Resp. Br. 11.)

{30} Inland claims that Mr. Bunch improperly permitted Winston Hospitality rather than an entity controlled by Inland to be named the purchaser in the contract for the RTP Westin site. (Pl.'s Resp. Br. 1.)

{31} Inland has asserted three claims against Mr. Bunch and Brown & Bunch, PLLC: (1) legal malpractice; (2) breach of fiduciary duty; and (3) tortious interference with prospective advantage. Inland contends that Mr. Bunch was liable for malpractice because he failed to protect Inland's interest when he allowed Winston Hospitality to be identified as the purchaser in the contract for the RTP Westin site. Inland's claims are based upon the fact that Mr. Bunch took no steps to advise Inland of the change in the name of the entity purchasing the RTP Westin site or to seek Inland's permission to make the change. Inland asserts that as a proximate result of Mr. Bunch's actions and omissions, it has been deprived of its rights in the RTP Westin site.

III.

THE MOTION

{32} Mr. Bunch and Brown & Bunch, PLLC have moved for summary judgment on all claims against them on the grounds that there is no genuine

issue as to any material fact and that they are entitled to a judgment as a matter of law.

## A.

## LEGAL STANDARD

{33} Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact. *Pembee Mfg. Corp. v. Cape Fear Constr. Co., Inc.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985) (citing *Texaco, Inc. v. Creel,* 310 N.C. 695, 314 S.E.2d 506 (1984)). The moving party may meet its burden by showing that an essential element of the non-moving party's claim is nonexistent. *See Collingwood v. G.E. Real Estate Equities,* 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). The burden then shifts back to the non-moving party to establish the existence of a prima facie case. *See id.*

## B.

## ANALYSIS

## 1.

## LEGAL MALPRACTICE/BREACH OF FIDUCIARY DUTY

## a.

## Violation of Standard of Care

{34} In a legal malpractice action based on an attorney's negligence, the plaintiff must prove by the greater weight of the evidence that the attorney breached a duty owed to the client and that the attorney's negligence is the proximate cause of the loss suffered. *Rorrer v. Cooke,* 313 N.C. 338, 355, 329 S.E.2d 355, 366 (1985); *Cornelius v. Helms,* 120 N.C. App. 172, 175–76, 461 S.E.2d 338, 340 (1995) (citing *Summer v. Allran*, 100 N.C. App. 182, 184, 394 S.E.2d 689, 690 (1990), *disc. rev. denied*, 328 N.C. 97, 402 S.E.2d 428 (1991)).

"[A] breach of fiduciary duty claim is essentially a negligence or professional malpractice claim." *Teague v. Isenhower*, 157 N.C. App. 333, 334, 579 S.E.2d 600, 602 n.1 (2003) (quoting *Childers v. Hayes*, 77 N.C. App. 792, 795, 336 S.E.2d 146, 148 (1985); *see also NationsBank v. Parker*, 140 N.C. App. 106, 113, 535 S.E.2d 597, 602 (2000) ("Breach of fiduciary duty is a species of negligence or professional malpractice."). Thus, the following analysis controls the claims for legal malpractice and breach of fiduciary duty.

{35} Mr. Bunch argues that Inland has failed to forecast competent evidence that he breached the applicable standard of care for real estate attorneys practicing in Wake County, North Carolina or a similar locality and that Inland cannot establish that any conduct of Mr. Bunch proximately caused any damages.

{36} The duties an attorney owes to his client are delineated in *Hodges v. Carter*, 239 N.C. 517, 80 S.E.2d 144 (1954).

> Ordinarily when an attorney engages in the practice of the law and contracts to prosecute an action on behalf of his client, he impliedly represents that (1) he possesses the requisite degree of learning, skill, and ability necessary to the practice of his profession and which others similarly situated ordinarily possess; (2) he will exert his best judgment in the prosecution of the litigation entrusted to him; and (3) he will exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to his client's cause.

*Hodges*, 239 N.C. at 519, 80 S.E.2d at 145–6. The standard for reasonable and ordinary care and diligence is that of "members of the profession in the same or similar locality under similar circumstances." *Rorrer,* 313 N.C. at 356, 329 S.E.2d at 366.

{37} In an effort to demonstrate a breach of the duty of care by Mr. Bunch, Inland offers the testimony of Thomas Metzloff, a Duke University law professor with a background in ethics. Mr. Metzloff determined that Mr. Bunch "violated the standard of care by assisting Winston, Crockett, or entities controlled by them with respect to the [RTP Westin] development

project."[3] (Inland's Designation of Expert Witness, Opinions Section ¶ 9.) Mr. Metzloff is not a practicing attorney. (Dep. of Thomas Metzloff ("Metzloff Dep.") 21:17–23:3.) He has not been licensed to practice law for over twenty-five (25) years, and he has never been licensed to practice law in North Carolina. (Metzloff Dep. 21:17–23:3.) He has never conducted any real estate transactions as a lawyer or represented any individual, partnership, joint venture, LLC, or corporation in any real estate transaction. (Metzloff Dep. 26:12–8.) He does not consider himself to be an expert in the practice of real estate development or the practice of law related to real estate developments. (Metzloff Dep. 60:11–25.) He does not know everything that a real estate lawyer does in representing a developer, putting together deals, and seeing them through to closing. (Metzloff Dep. 60:11–25.) Mr. Metzloff concedes, for example, that he does "not know for sure" what the standard of care is for written engagement letters for an attorney handling the type of transaction at issue in this case. (Metzloff Dep. 122:1–10.)

{38} Mr. Metzloff lacks the qualifications to give a competent opinion as to whether Mr. Bunch's actions with regard to the RTP Westin contract were within the applicable standard of care for a commercial real estate transactional attorney practicing in the Research Triangle area or a similar community. Mr. Metzloff does claim expertise in the North Carolina Rules of Professional Conduct, and those rules are Mr. Metzloff's only articulated basis for his opinion that Mr. Bunch's actions or omissions fell short of the standard. (Inland's Designation of Expert Witness 3–8.)

{39} Yet, North Carolina appellate courts repeatedly have rejected the use of the Rules of Professional Conduct to establish attorney liability. *See Baars v. Campbell Univ. Inc.*, 148 N.C. App. 408, 421, 558 S.E.2d 871, 879 (2002); *Webster v. Powell*, 98 N.C. App. 432, 439, 391 S.E.2d 204, 208 (1990),

---

[3] In making his determination, Mr. Metzloff did not consider facts that indicate Inland clothed Mr. Crockett with the actual and/or apparent authority to change the name on the contract to preserve the deal for the joint venture. (*See* Inland's Designation of Expert Witness 3–8.)

*aff'd*, 328 N.C. 88, 399 S.E.2d 113 (1991); *McGee v. Eubanks*, 77 N.C. App. 369, 374, 335 S.E.2d 178, 181 (1985). In *Baars*, the Court of Appeals held, "a breach of a provision of the Code of Professional Responsibility is not in and of itself . . . a basis for civil liability . . . . " 148 N.C. App. at 421, 558 S.E.2d at 879 (internal quotations removed).

{40} This rule of law has been incorporated into Rule 0.2[7] of the Rules of Professional Conduct. *Id.*

> Violation of a Rule should not give rise itself to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached . . . . The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability . . . . Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a Rule.

*R. Prof. Conduct N.C. St. B.* 0.2[7].

{41} The plain language of this provision, like that of *McGee* and its progeny, establishes that the North Carolina Rules of Professional Conduct cannot be used to establish civil liability. Furthermore, the Court in *Webster* held that evidence offered to show a lawyer violated certain rules of professional conduct was properly excluded by the trial court. 98 N.C. App. at 439, 391 S.E.2d at 208; *see also Baars*, 148 N.C. App. at 421, 558 S.E.2d at 879 ("[E]vidence of purported rules violations is properly excluded when a case is subject to dismissal.")

{42} The purpose of putting on evidence as to the standard of care in a malpractice lawsuit is to determine whether the defendants' actions meet the applicable standard. *Progressive Sales, Inc. v. Williams, Willeford, Boger, Grady & Davis*, 86 N.C. App. 51, 56, 356 S.E.2d 372, 376 (1987). When a plaintiff fails to offer testimony or affidavits of attorneys in the area of practice in the defendant's legal community, dismissal is proper. *See id.;*

*Laws v. Priority Tr. Services of N.C., L.L.C.*, 610 F. Supp. 2d 528, 530–31 (W.D.N.C. 2009), *aff'd*, No. 09-1432 (4th Cir. Apr. 28, 2010) (per curium) (unpublished opinion) (dismissal of a legal malpractice complaint that failed to identify a formal legal duty independent of those articulated in the Rules of Professional Conduct or the corresponding State Bar ethics opinions).

{43}   The circumstances of this case and the complexities of the relationships between the parties are such that a determination of a breach of the standard of care cannot be determined by an ethics professor who does not practice law in commercial real estate.  Likewise, the applicable standard of care cannot be determined, as Plaintiff suggests, by lay persons.  Inland must have a competent expert to provide evidence of a breach of the standard of care.

{44}   There is no admissible evidence from Inland of the standard by which Mr. Bunch's actions and alleged omissions are to be weighed.  Thus, Inland has failed to forecast competent evidence that Mr. Bunch violated the applicable standard of care.

{45}   Because the Court finds that Plaintiff failed to forecast any evidence of breach, it is not necessary to reach the causation issue.


b. Actual Authority

{46}   Based on the facts Mr. Bunch knew on July 11, 2007, it was reasonable for him to believe that Mr. Crockett had the actual authority from Inland to change the name on the contract to purchase the RTP Westin from Winn LP or Winston Hotels to Winston Hospitality in order to get the deal closed.

{47}   "Actual authority is that authority which the agent reasonably thinks he possesses, conferred either intentionally or by want of ordinary care by the principal." *Harris v. Ray Johnson Constr. Co.*, 139 N.C. App. 827, 830, 534 S.E.2d 653, 655 (2000).

{48}  Mr. Crockett had been pursuing the RTP Westin site since early 2007.  Before Inland and Winston Hotels merged, he had conducted negotiations with the seller, and he already had a valuable business relationship with Mr. Sanchez, the seller's agent.  Inland wanted the benefit the predevelopment work Mr. Crockett had done on the RTP Westin leading up to the date of the merger.  For this reason, when Inland, Mr. Crockett, and Mr. Winston entered into the Master Agreement at the end of July, the parties made it retroactive to July 1, 2007.  As a result of that Mr. Crockett possessed the actual authority to act to preserve the RTP Westin opportunity for the joint venture.

{49}  Though Mr. Bunch could not have known on July 11, 2007 that the Master Agreement would be made retroactive to July 1, 2007, Mr. Bunch did understand on July 11th that the parties to the Master Agreement had agreed in principle to form a joint venture and were actively negotiating the agreement's terms.  He knew that Inland expected Mr. Crockett to engage and direct lawyers in their work on the RTP Westin and on other development opportunities that were in various stages of investigation and pursuit.  He knew the joint venture would develop additional hotel properties and would do as many deals as possible.  He knew that Mr. Crockett was a necessary party to the RTP Westin deal and that Inland would lose the opportunity to develop it if the contract was not executed quickly.  Also, Mr. Crockett informed Mr. Bunch that he was pursuing the property for the joint venture the parties were forming.  Mr. Bunch's letter of September 13, 2010 to the seller demonstrates his belief that the opportunity was being pursued for the joint venture.  There is no evidence that Mr. Bunch knew that Mr. Crockett was acting in any capacity other than as agent for Inland, and no evidence that Mr. Bunch knew or understood that Mr. Crockett, Mr. Winston, and Winston Hospitality were acting in their own interests.

{50}  Inland's representative, John Brown, stated in his testimony that Mr. Crockett had the authority to do what was necessary for the

predevelopment work, including the authority to negotiate contracts and hire lawyers. Mr. Brown's testimony proved consistent with Mr. Crockett's comments to Mr. Bunch about his authority and with Mr. Bunch's understanding that Mr. Crockett was his point of contact for Inland with respect to the joint venture's development opportunities, including the RTP Westin.

{51} Under the circumstances, Mr. Bunch had a reasonable belief that Mr. Crockett had the actual authority to change the buyer to Winston Hospitality.

### c. Apparent Authority

{52} While it is clear that Mr. Bunch believed Mr. Crockett had the actual authority to direct him to change the name of the purchaser, at a minimum, insofar as Mr. Bunch was concerned, Mr. Crockett also possessed the apparent authority to do so.

{53} Apparent authority "is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses." *Zimmerman v. Hogg & Allen, P.A.,* 286 N.C. 24, 31, 209 S.E.2d 795, 799 (1974).

{54} In late June or early July 2007, Mr. Crockett informed Mr. Bunch that Mr. Goodwin, Inland's Chairman, assured him that though the Master Agreement had not yet been executed, the parties would form a joint venture as planned. (Bunch Dep. 85:16–88:11.) Based on Mr. Crockett's representations, Mr. Bunch believed that the parties would finalize the Master Agreement. (Bunch Dep. 88:7–11.) Based on Mr. Crockett's representations, Mr. Bunch understood that Crockett Capital's goal was to get the Pipeline Properties under contract in order to preserve the business opportunities for the joint venture, and then proceed in accordance with future agreements for the individual properties. (Bunch Dep. 110:20–5.)

{55}   Mr. Crockett communicating Mr. Goodwin's assurances to Mr. Bunch gave Mr. Bunch a reasonable and actual belief that Inland had granted Mr. Crockett the authority to change the name on the RTP Westin contract to Winston Hospitality in order to close the deal.  Even if Mr. Crockett had no actual authority to change the name, he had the apparent authority to act to preserve the opportunity for the joint venture.

{56}   Inland was aware of Mr. Crockett's efforts to get the Pipeline Properties under contract.  Inland allowed Mr. Crockett to act on its behalf.  Inland took no action which would have communicated in any way that Mr. Crockett did not have the authority he exercised in securing the RTP Westin site.

{57}   From Mr. Bunch's standpoint, Mr. Crockett had the apparent authority to change the name of the purchaser on the contract.

{58}   Based upon Mr. Crockett's actual and apparent authority, Mr. Bunch did not violate any standard of care in following Mr. Crockett's instructions.


2.
TORTIOUS INFERENCE WITH PROSPECTIVE
BUSINESS ADVANTAGE

{59}   To support a claim for tortious interference with prospective economic advantage, a plaintiff must put forth evidence that a defendant interfered with a trade or business by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference. *Spartan Equip. Co. v. Air Placement Equip. Co.*, 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965).  The plaintiff must further show damages and that the interference was not done "in the legitimate exercise of the interfering person's rights, but with a malicious design to injure the third person or gain some advantage at his expense." *Id.*

{60}   Inland has not forecast evidence to support its claim that Mr. Bunch tortiously interfered with Inland's prospective economic advantage with respect to the RTP Westin transaction.  First, Inland has forecast no evidence that Mr. Bunch acted with malicious design to injure Inland.  Indeed, the evidence indicates to the contrary—that Mr. Bunch's intent was to further the opportunity for the benefit of the joint venture, which included Inland.  Second, the uncontroverted evidence shows that Mr. Crockett handled the negotiations with the seller, and that Mr. Crockett made the decision with Mr. Sanchez to change the name of the contract purchaser with no input or consultation from Mr. Bunch.  It was Mr. Crockett who changed the name on the contract.  Third, the evidence indicates that the seller likely would not have entered into the contract with Inland absent the participation of Messrs. Crockett and Winston.

{61}   Thus, Inland cannot present evidence to satisfy a claim against Mr. Bunch for tortious interference with prospective business advantage.

IV.

CONCLUSION

{62}   Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that: Defendants William W. Bunch, III and Brown & Bunch, PLLC's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED, this 24th day of November, 2010.