NELSON CAMPOS-BRIZUELA, Plaintiff v. ROCHA MASONRY, L.L.C., Employer, and BUILDERS MUTUAL INSURANCE COMPANY, Carrier, Defendants

No. COA10-1571

(Filed 4 October 2011)

**1. Workers' Compensation—jurisdiction—employee—reasonable belief**

The Industrial Commission did not err in a workers' compensation case by concluding that plaintiff was, in fact, an employee under N.C.G.S. § 97-2(2) for purposes of the administration of the Workers' Compensation Act. Plaintiff was performing work for the benefit of the employer at the time of his injury. Plaintiff reasonably believed that he had been hired by someone with authority to do so and had no idea that the management took a different position.

**2. Workers' Compensation—total disability—sufficiency of findings**

The Industrial Commission did not err in a workers' compensation case by concluding as a matter of law that plaintiff has been totally disabled since 16 April 2009. The record contained medical evidence that plaintiff was incapable of work in any employment, as a consequence of the work-related injury. The fact that the record did not address issues relating to the reason-

ableness of any efforts that plaintiff might have made to find other work or the types of work that were available to plaintiff did not undercut the Commission's disability determination.

Appeal by defendants from Opinion and Award entered 31 August 2010 by the North Carolina Industrial Commission. Heard in the Court of Appeals 16 August 2011.

*Farah & Cammarano, P.A., by N. Victor Farah and Gina E. Cammarano, for Plaintiff-appellee.*

*Lewis & Roberts, P.L.L.C., by Timothy S. Riordan, J. Timothy Wilson, and Mallory E. Williams, for Defendant-appellants.*

ERVIN, Judge.

Defendants Rocha Masonry, L.L.C., and Builders Mutual Insurance Company appeal from an order awarding medical and disability benefits to Plaintiff Nelson Campos-Brizuela. On appeal, Defendants argue that the Commission erred by asserting jurisdiction over Plaintiff's claim and by determining that Plaintiff was disabled. After careful consideration of Defendants' challenges to the Commission's order in light of the record and the applicable law, we conclude that the Commission's order should be affirmed.

## I. Background

### A. Substantive Facts

Plaintiff was born in El Salvador in 1972. In approximately 2000, Plaintiff moved to Maryland, where he found work as a driver. In 2009, Plaintiff moved to North Carolina in pursuit of greater employment opportunities.

In April 2009, Plaintiff became acquainted with Felipe Quintero. Mr. Quintero worked for Defendant Rocha Masonry, which had a contract to spread concrete at Caleb's Creek Elementary School in Kernersville. After hiring Plaintiff to work at the Caleb's Creek Elementary School site on 15 April 2009, Mr. Quintero gave Plaintiff a ride to that location on the following day. After working for several hours, Plaintiff suffered a "near amputation" injury when his hand was crushed while cleaning a concrete pump. As a result of this injury, Plaintiff had to undergo surgery and was hospitalized for several days. As of 31 March 2010, Plaintiff had not regained the use of his hand, had "no appreciable wrist motion," and had "virtually no motion of the fingers."

## B. Procedural History

On 12 May 2009, Defendants filed a Form 19 providing notice of Plaintiff's injury. On the same date, Defendants filed a Form 61 denying Plaintiff's claim for workers' compensation benefits on the grounds that Plaintiff was not employed by Defendant Rocha Masonry at the time of his injury. On 20 May 2009, Plaintiff filed a Form 33 requesting a hearing concerning his claim for workers' compensation benefits.

On 17 February 2010, Deputy Commissioner James C. Gillen issued an Opinion and Award concluding that Plaintiff had failed to prove that he was employed by Defendant Rocha Masonry on 16 April 2009 and that the Commission lacked jurisdiction over Plaintiff's claim for that reason. Plaintiff appealed Deputy Commissioner Gillen's order to the Commission. On 31 August 2010, the Commission, by means of an Opinion and Award issued by Commission Chair Pamela T. Young, with the concurrence of Commissioners Danny Lee McDonald and Staci Meyer, reversed Deputy Commissioner Gillen's order and ruled that Plaintiff was employed by Defendant Rocha Masonry at the time of his injury. As a result, the Commission awarded medical and disability benefits and attorneys' fees to Plaintiff. Defendants noted an appeal to this Court from the Commission's order.

## II. Legal Analysis

## A. Jurisdiction

## 1. Standard of Review

[1] "The plaintiff bears the burden of proving each element of compensability . . . by 'a preponderance of the evidence.' " *Everett v. Well Care & Nursing Servs.*, 180 N.C. App. 314, 318, 636 S.E.2d 824, 827 (2006) (quoting *Holley v. ACTS, Inc.*, 357 N.C. 228, 232, 234, 581 S.E.2d 750, 752 (2003)). For that reason, "the claimant bears the burden of proving the existence of an employer-employee relationship at the time of the accident." *McCown v. Hines*, 353 N.C. 683, 686, 549 S.E.2d 175, 177 (2001) (citing *Lucas v. Stores*, 289 N.C. 212, 218, 221 S.E.2d 257, 261 (1976)).

> [T]he existence of an employer-employee relationship at the time of the injury constitutes a jurisdictional fact. . . . "The finding of a jurisdictional fact by the Industrial Commission is not conclusive upon appeal even though there be evidence in the record to support such finding. The reviewing court has the right, and the duty,

to make its own independent findings of such jurisdictional facts from its consideration of all the evidence in the record."

*McCown,* 353 N.C. at 686, 549 S.E.2d at 177 (citing *Youngblood v. North State Ford Truck Sales,* 321 N.C. 380, 383, 364 S.E.2d 433, 437 (1988), and quoting *Lucas,* 289 N.C. at 218, 221 S.E.2d at 261). Appellate courts decide disputed issues of jurisdictional fact based on the greater weight of the evidence. *Youngblood,* 321 N.C. at 384, 364 S.E.2d at 437.

> In performing our task to review the record de novo and make jurisdictional findings independent of those made by the Commission, we are necessarily charged with the duty to assess the credibility of the witnesses and the weight to be given to their testimony, using the same tests as would be employed by any fact-finder in a judicial or quasi-judicial proceeding.

*Morales-Rodriguez v. Carolina Quality,* ___ N.C. App. ___, ___, 698 S.E.2d 91, 94 (2010). Although we have not had an opportunity to observe the demeanor of the witnesses, we are, in that respect, in the same position as the Commission, which based its findings on information contained in the written record rather than relying upon testimony provided by live witnesses.

> Whether the full Commission conducts a hearing or reviews a cold record, [N.C. Gen. Stat.] § 97-85 places the ultimate fact-finding function with the Commission—not the hearing officer. It is the Commission that ultimately determines credibility, whether from a cold record or from live testimony. Consequently, in reversing the deputy commissioner's credibility findings, the full Commission is not required to demonstrate, as *Sanders [v. Broyhill Furniture Industries,* 124 N.C. App. 637, 641, 478 S.E.2d 223, 226 (1996),] states, "that sufficient consideration was paid to the fact that credibility may be best judged by a first-hand observer of the witness when that observation was the only one." To the extent that *Sanders* is inconsistent with this opinion, it is overruled.

*Adams v. AVX Corp.,* 349 N.C. 676, 681, 509 S.E.2d 411, 413-14 (1998) (quoting *Sanders,* 124 N.C. App. at 641, 478 S.E.2d at 226, *disc. rev. denied,* 346 N.C. 180, 486 S.E.2d 208 (1997), *overruled in part as stated*). In making the necessary credibility determination, we also "consider the [tests enunciated in the] North Carolina pattern jury instructions, which" state that a credibility determination should rest

upon the use of " 'the same tests of truthfulness which you apply in your everyday lives. . . .' " *In re Hayes*, 356 N.C. 389, 404-05, 584 S.E.2d 260, 270 (2002) (quoting N.C.P.I.-Civil 101.15 (1994)). After carefully reviewing the record, we conclude that Plaintiff was, in fact, an employee of Rocha Masonry for purposes of the administration of the Workers' Compensation Act.

## 2. Factual Analysis

According to the undisputed evidence, Plaintiff was at a job site at which Defendant Rocha Masonry had a contract to pour concrete and was engaged in cleaning a machine used by Defendant Rocha Masonry while performing that contract at the time of his injury. In addition, we find Plaintiff's testimony to the effect that he was cleaning the machine at the direction of Mr. Quintero to be credible. As a result, we find, in accordance with the essentially uncontested evidence, that Plaintiff was performing work for the benefit of Defendant Rocha Masonry at the time of his injury.[1]

In challenging the Commission's jurisdiction over Plaintiff's claim, Defendants argue that, because Plaintiff was hired by an employee of Defendant Rocha Masonry who lacked the authority to make such a decision, Plaintiff was not employed by Defendant Rocha Masonry for workers' compensation purposes at the time of his injury. In essence, Defendants contend that (1) Plaintiff was hired by Mr. Quintero; (2) Mr. Quintero had not been given the authority to hire assistants by the appropriate officials at Defendant Rocha Masonry; (3) Mr. Quintero did not inform Plaintiff of the identity of the company he worked for; and (4), because Plaintiff was hired by an individual who lacked the authority to make employment decisions and did not mention that Plaintiff would be working for Defendant Rocha Masonry, Plaintiff never established that he was employed by Defendant Rocha Masonry for workers' compensation purposes. Defendants' argument lacks merit.

At the hearing, Plaintiff testified that Mr. Quintero "contracted [with him] to go to work with [Mr. Quintero]." On the following day, as Mr. Quintero drove Plaintiff to the job site, he informed Plaintiff that Plaintiff would be earning $9.00 an hour and that Plaintiff would

---

1. Defendants have not argued that Plaintiff was a trespasser, a volunteer, or an independent subcontractor at the time that he worked at the Caleb's Creek Elementary School. As a result, Defendants appear to concede that Plaintiff was working for someone at the time of his injury and that this work clearly benefitted Defendant Rocha Masonry.

be paid by a company check drawn on the account of Mr. Quintero's employer. "The way [that Mr. Quintero] describe[d] it to [Plaintiff, he] felt that he had authority . . . to hire [Plaintiff] to do work for this company." After arriving at the job site, Plaintiff observed Mr. Quintero "giving orders to a lot of people" and assumed that the others at the job site worked for Mr. Quintero's employer as well.

At first, Mr. Quintero "told [Plaintiff] to work, to help the people that are higher." "After that, since [Mr. Quintero] was [his] immediate boss, [Plaintiff] asked him what [he] should do next." In response, Mr. Quintero directed Plaintiff to clean a machine. As he attempted to perform the requested operation, Plaintiff's hand was crushed.[2]

Plaintiff's testimony was corroborated to some extent by that of other witnesses. Mark Atkinson, an attorney who had previously represented Plaintiff, testified that, during his investigation of Plaintiff's claim, he spoke with Mr. Quintero. At that time, Mr. Quintero told Mr. Atkinson that, when Plaintiff was injured, he had been an employee of Defendant Rocha Masonry. Edwin Guevara, an attorney licensed to practice in El Salvador, served as the interpreter during a conversation between Mr. Quintero and Plaintiff's counsel that occurred on the morning of the hearing held before Deputy Commissioner Gillen. At that time, Mr. Quintero stated that, when it was necessary to provide a certificate of workers' compensation insurance to the general contractor associated with a particular job, the customary practice was for Raoul Rocha, who owned Defendant Rocha Masonry, to give the certificate to Mr. Quintero for transmission to the general contractor's representative. In addition, Mr. Quintero told Mr. Guevara that "he usually gets some helpers for the job site." This testimony corroborates Plaintiff's claim that Mr. Quintero appeared to have a position of responsibility with Defendant Rocha Masonry and provides evidence that he made a practice of hiring employees, including Plaintiff, to work for Defendant Rocha Masonry.

Although Mr. Quintero testified that he worked for Defendant Rocha Masonry on 16 April 2009, he claimed that he did not occupy a managerial or supervisory position and denied having the authority to hire employees for Defendant Rocha Masonry. However, Mr. Quintero admitted that he had hired helpers for other jobs. In addition, Mr. Quintero denied having ever mentioned the name of his employer while speaking with Plaintiff. Mr. Quintero indicated that he owned

---

2. As a result of the fact that the machine lacked the proper safety guard, Defendant Rocha Masonry was cited by the Occupational Safety and Health Administration and paid a $700.00 fine.

the machine used to pour concrete at the Caleb's Creek Elementary School site and rented it to other contractors on occasion.[3] Initially, Mr. Quintero said that he earned $17.00 an hour and intended to pay Plaintiff $9.00 from his own earnings. On another occasion, however, Mr. Quintero testified that he did not operate an independent business and that he drove Plaintiff to the job site for the purpose of allowing Plaintiff to seek work from other subcontractors. As a result, given these inconsistencies, we conclude that Mr. Quintero's testimony is entitled to little credibility.

Thus, in light of the factual and credibility-related determinations that we have made during our review of the record evidence, we make the following findings of jurisdictional fact, which are substantively identical to the relevant findings made by the Commission:

1. It was Plaintiff's understanding that he was being hired by Mr. Quintero on 15 April 2009 to work for Mr. Quintero's employer (later identified as Defendant Rocha Masonry). In light of the way that Mr. Quintero described his relationship with Defendant Rocha Masonry, Plaintiff believed that Mr. Quintero had the authority to hire him to perform work for Defendant Rocha Masonry relating to the concrete project at Caleb's Creek Elementary School.

2. On the morning of 16 April 2009, Mr. Quintero transported Plaintiff to the job site. On the way, Mr. Quintero told Plaintiff that there was a lot of work to be done on the project and that he would be paid $9.00 an hour for his work by means of a company check drawn on the account of Mr. Quintero's employer.

3. After Plaintiff and Mr. Quintero arrived at the job site on 16 April 2009, Mr. Quintero began giving orders to other workers. The job in which Defendant Rocha Masonry was engaged involved spreading concrete. Mr. Quintero was in charge of the concrete pump that was present at the job site and was the only person at that location who was authorized to use the machine. In addition, Mr. Quintero appeared to be responsible for supervising and directing individuals involved in working on the Caleb's Creek Elementary School concrete project on behalf of Defendant Rocha Masonry.

---

3. Mr. Rocha, on the other hand, testified that Mr. Quintero did not own the machine.

CAMPOS-BRIZUELA v. ROCHA MASONRY, L.L.C.

[216 N.C. App. 208 (2011)]

4. In order for Defendant Rocha Masonry to lawfully perform work on the Caleb's Creek Elementary School job site, a certificate of workers' compensation insurance had to be faxed to Ramirez Masonry, the company that subcontracted this concrete project out to Defendant Rocha Masonry. Aside from supervising workers and overseeing the operation of the concrete pump, Mr. Quintero provided Defendant Rocha Masonry's certificate of workers' compensation insurance to the appropriate up-the-line contractor.

5. Defendant Rocha Masonry clothed Mr. Quintero with authority to act on its behalf by allowing Mr. Quintero to work on an unsupervised basis at job sites, to supervise and direct workers on the Caleb's Creek Elementary School concrete project, and to oversee the operation of the concrete machine pump, and by relying on Mr. Quintero to provide Defendant Rocha Masonry's workers' compensation insurance certificate to other contractors. Although the contradictory testimony given by Mr. Quintero and Mr. Rocha leaves the actual ownership of the concrete pump unclear, Mr. Quintero clearly had the authority to operate that piece of equipment on behalf of Defendant Rocha Masonry. It was reasonable for Plaintiff and others to believe that Mr. Quintero's authority encompassed hiring helpers to complete any work associated with the Caleb's Creek Elementary School project.

6. The scope of Mr. Quintero's apparent authority to act on behalf of Defendant Rocha Masonry included the apparent authority to hire workers as necessary in order to complete the projects that Mr. Quintero was responsible for supervising, including the concrete project at issue in this case. While Mr. Rocha and Mr. Quintero claimed that Mr. Quintero was not authorized to hire Plaintiff on behalf of Defendant Rocha Masonry, there is no evidence that Mr. Quintero was reprimanded, disciplined, or terminated for bringing Plaintiff to the job site and putting him to work on the concrete project on 16 April 2009 despite the fact that Plaintiff was severely injured on that occasion. Therefore, we find that the claim that Mr. Quintero lacked the authority to hire workers for Defendant Rocha Masonry is not credible.

7. Mr. Quintero was acting within the scope of his apparent authority to act on behalf of Defendant Rocha Masonry when he hired Plaintiff on 15 April 2009. Plaintiff's belief that Mr. Quintero had the authority to hire him (and his belief that Mr. Quintero did in fact hire him) on behalf of Defendant Rocha Masonry was reasonable. As a result, we find that Plaintiff acted in good faith,

CAMPOS-BRIZUELA v. ROCHA MASONRY, L.L.C.

[216 N.C. App. 208 (2011)]

exercised reasonable prudence, and was not on notice of any limitations placed upon Mr. Quintero's authority by Defendant Rocha Masonry.

### 3. Legal Analysis

"The workers' compensation system is a creature of statute enacted by the General Assembly and is codified in Chapter 97 of the North Carolina General Statutes." *Frost v. Salter Path Fire & Rescue*, 361 N.C. 181, 184, 639 S.E.2d 429, 432 (2007). N.C. Gen. Stat. § 97-2(2) provides, in pertinent part, that "[t]he term 'employee' means every person engaged in an employment under any appointment or contract of hire or apprenticeship, express or implied, oral or written, including aliens, and also minors, whether lawfully or unlawfully employed." "Where . . . the statute, itself, contains a definition of a word used therein, that definition controls." *In re Clayton-Marcus Co.*, 286 N.C. 215, 219, 210 S.E.2d 199, 203 (1974) (citation omitted). As is discussed in more detail above, we have found that Mr. Quintero hired Plaintiff to work at the Caleb's Creek Elementary School job site, drove Plaintiff to the job, told him that he would be earning $9.00 an hour paid by means of a check drawn on the account of Mr. Quintero's employer, and directed the activities of Plaintiff and of others while at the job site. We conclude that this evidence is more than sufficient to establish that Plaintiff was an "employee" of Defendant Rocha Masonry as that term is used in N.C. Gen. Stat. § 97-2(2).

In seeking to persuade us to reach a contrary conclusion, Defendants have not discussed the statutory definition of an employee set out in N.C. Gen. Stat. § 97-2(2) in any detail. Instead, Defendants argue that, even if Mr. Quintero hired Plaintiff to work in connection with the concrete spreading contract at the Caleb's Creek Elementary school job site, the fact that Defendant Rocha Masonry had not authorized Mr. Quintero to make hiring decisions and that Mr. Quintero never told Plaintiff the name of the company for whom he would be working precludes Plaintiff, as a matter of law, from relying on Mr. Quintero's apparent authority to hire helpers to work on the concrete spreading job. In effect, Defendants argue that, in order to determine whether Plaintiff is an employee for workers' compensation purposes, we must apply certain common law rules developed in connection with the resolution of liability issues arising from interactions between an agent, the principal represented by that agent, and a third party with whom that agent dealt. More specifically, Defendants argue that "there can be no apparent authority created by an undisclosed principal."

The rule upon which Defendants rely has been principally utilized for the purpose of determining the relative liabilities of an agent and a principal in cases in which the agent failed to inform the third party of the principal's existence. *Howell v. Smith*, 261 N.C. 256, 258-59, 134 S.E.2d 381, 383 (1964) (holding that "[a]n agent who makes a contract for an undisclosed principal is personally liable as a party to it unless the other party had actual knowledge of the agency and of the principal's identity") (citing *Walston v. Whitley & Co.*, 226 N.C. 537, 39 S.E.2d 375 (1946) and *Restatement of Agency 2d* § 322) (other citations omitted). According to Defendants, this common law principle is applicable to jurisdictional determinations required under the Workers' Compensation Act, so that an individual is precluded from receiving workers' compensation benefits in the event that he or she is hired by an individual who had not been previously authorized to make hiring decisions or who failed to provide the corporate name of the applicable employer. In Defendants' view, "[t]his Court adopted and relied upon this rule of law to deny an injured worker's action against an alleged principal in *Hughart v. Dasco Transp., Inc.*, 167 N.C. App. 685, 606 S.E.2d 379 (2005)." We are not persuaded by Defendants' argument.

In *Hughart*, a trucking company named Dasco subcontracted the administration of needed payroll and bookkeeping services to a third party named SOI. As we noted in our opinion:

> Defendant SOI provides administrative services to small and medium-sized companies. Dasco and SOI entered into a service agreement under which SOI, in return for a fee, approved prospective Dasco employees and then handled payroll services and insurance, including workers' compensation insurance, for those employees, called "assigned employees." Dasco was exclusively responsible for managing and supervising the assigned employees. In order to meet its staffing needs, Dasco relied not only on the assigned employees, but also on employees of another trucking company and independent contractors.

*Hughart*, 167 N.C. App. at 687-88, 606 S.E.2d at 381-82. The plaintiff in *Hughart* was hired to work for Dasco as an assistant driver. The Commission found that, because SOI had given a Dasco employee named Shipley the apparent authority to hire helpers, SOI was equitably estopped from denying that the plaintiff was a joint employee of both companies. On appeal, we held that the doctrine of equitable estoppel could not be applied to give Shipley the apparent authority to act on behalf of SOI on the grounds that the record contained no

evidence that the plaintiff was even aware that Dasco had subcontracted some of its administrative responsibilities:

> "The rights and liabilities which exist between a principal and a third party dealing with that principal's agent may be governed by the apparent scope of the agent's authority[, but] . . . the determination of a principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had . . . conferred upon his agent." . . . Because there is no evidence that [the plaintiff] was aware of SOI or that SOI was aware of [the plaintiff] we hold that the Commission erred in concluding that SOI was estopped from denying that [plaintiff] was its employee.

*Hughart* at 691-92, 606 S.E.2d at 384 (quoting *Zimmerman v. Hogg & Allen*, 286 N.C. 24, 30-31, 209 S.E.2d 795, 799 (1974)). A careful reading of our *Hughart* opinion establishes that the Court never held that, if the plaintiff had reasonable grounds to believe he was being hired on behalf of the company to whom Dasco had subcontracted administrative work, SOI would have been able to evade responsibility for any workers' compensation benefits to which he was entitled on the grounds that Shipley lacked the actual authority to hire the plaintiff or failed to tell the plaintiff of SOI's identity. Instead, our decision in *Hughart* focused on the fact that the plaintiff never knew that SOI even existed. In this case, Plaintiff was aware that Mr. Quintero was hiring him on behalf of Mr. Quintero's employer and reasonably relied on Mr. Quintero's representations to that effect. Thus, *Hughart* does not support, much less necessitate, a decision in Defendants' favor.

Defendants also rely on *Lucas*, 289 N.C. at 222, 221 S.E.2d at 264, which is readily distinguishable from this case as well. In *Lucas*, the plaintiff was fired from his employment at a convenience store and instructed not to return to its premises. Subsequently, the plaintiff sought workers' compensation benefits stemming from injuries that he suffered while assisting his wife at the convenience store where he had previously worked. The undisputed record evidence showed that, even if the plaintiff had been told by employees assigned to the store in question that he could work there, the plaintiff was aware that his presence in the store violated the express orders of company management. As a result, the Supreme Court held that, because the plaintiff was fully aware that those with authority for making hiring decisions had expressly instructed him not to work at the store, he could not rely on a theory of "apparent authority" in order to obtain work-

ers' compensation benefits. In this case, however, Plaintiff reason-ably believed that he had been hired by someone with the authority to do so and had no idea that the management of Defendant Rocha Masonry took a different position.

Any decision on our part to adopt the approach advocated by Defendants would require every job applicant to ascertain, at the risk of losing the ability to obtain workers' compensation benefits, whether the person who hired him on behalf of an employing entity is acting within the scope of his actual authority. The statutory defini-tion of an "employee" set out in N.C. Gen. Stat. § 97-2(2) contains no such requirement, and we see no basis in the applicable rules of statu-tory construction for imposing one as a matter of judicial fiat. As a result, we reject Defendants' contention that Plaintiff's eligibility for workers' compensation benefits is precluded by the necessity for strict compliance with the common law principle upon which Defend-ants rely.

In reaching this conclusion, we find the reasoning set out in *Baker v. Rushing*, 104 N.C. App. 240, 248, 409 S.E.2d 108 (1991), per-suasive. *Baker* involved a dispute between evicted tenants of a resi-dential hotel and its individual and corporate owners. In reversing the trial court's grant of summary judgment in favor of the defendants, we considered the parties' arguments concerning whether an individ-ual defendant was acting on behalf of an "undisclosed principal" cor-porate owner of the hotel. In rejecting that contention, we stated that:

> The [Residential Rental Agreements] Act defines a landlord as: "any owner and any rental management company, rental agency, or any other person having the actual or apparent authority of an agent to perform the duties imposed by this Article." [N.C. Gen. Stat.] § 42-40(3) (1984). This broad, statutory definition of land-lord makes irrelevant in determining the liability of an agent the common law distinction between disclosed and undisclosed prin-cipals. . . . *See Allen v. Standard Crankshaft & Hydraulic Co.*, 210 F. Supp. 844 (W.D.N.C. 1962), *aff'd*, 323 F.2d 29 (4th Cir. 1963) (where the General Assembly has legislated with respect to the subject matter of a common law rule, the statute supplants the common law with respect to the particular rule).

*Baker*, 104 N.C. App. at 248-49, 409 S.E.2d at 113. Similarly, we con-clude that the broad statutory definition of "employee" contained in N.C. Gen. Stat. § 97-2(2) renders it unnecessary for us to finely parse the common law distinctions between disclosed, unidentified, and

undisclosed principals as applied to this case. As we have already concluded, the credible evidence in the record clearly establishes that Mr. Quintero hired Plaintiff to work for Defendant Rocha Masonry at the Caleb's Creek Elementary School site while having the apparent authority to do so. As long as the statutory definition is satisfied, as it is in this case, a plaintiff need not make any additional showing in order to be eligible to receive workers' compensation benefits. Thus, Defendants are not entitled to appellate relief on the basis of their challenge to the Commission's jurisdiction over Plaintiff's claim.

## B.  Disability

[2]  Secondly, Defendants argue that the Commission "erred in concluding, as a matter of law, that [Plaintiff] has been totally disabled since 16 April 2009, given the absence of record evidence and factual findings on the issue." According to Defendants, Plaintiff "offered no evidence regarding his wage earning capacity—before or after the incident—or the reason for his alleged inability to work . . . [and] offered no testimony or other evidence regarding any attempts to return to work . . . [and] no expert medical testimony to support a claim that he is unable to work in any employment." We do not find Defendants' argument persuasive.

### 1.  Definition of "Disability"

"An employee injured in the course of his employment is disabled . . . if the injury results in an 'incapacity . . . to earn the wages which the employee was receiving at the time of the injury in the same or any other employment.' " *Russell v. Lowe's Product Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) (quoting N.C. Gen. Stat. § 97-2(9) (1991)). "Accordingly, 'disability' as defined in the Workers' Compensation Act is the impairment of the injured employee's earning capacity and not physical disablement." *Russell*, 108 N.C. App. at 765, 425 S.E.2d at 457 (citing *Peoples v. Cone Mills Corp.*, 316 N.C. 426, 434, 342 S.E.2d 798, 804 (1986)). "[I]n order to support a conclusion of disability, the Commission must find: (1) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and (3) that this individual's incapacity to earn was caused by plaintiff's injury." *Hilliard v. Apex Cabinet Co.*, 305 N.C. 593, 595, 290 S.E.2d 682, 683 (1982). "The employee seeking compensation under the Act bears 'the burden of proving the existence of [his] disability and its extent.' " *Clark v. Wal-*

*Mart,* 360 N.C. 41, 43, 619 S.E.2d 491, 493 (2005) (quoting *Hendrix v. Linn-Corriher Corp.,* 317 N.C. 179, 185, 345 S.E.2d 374, 378 (1986)). "The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, *i.e.,* age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury." *Russell,* 108 N.C. App. at 765, 425 S.E.2d at 457 (internal citations omitted).

### 2. Sufficiency of Commission's Disability Determination

In its order, the Commission found, in pertinent part, that:

16. On April 16, 2009, Mr. Quintero instructed Plaintiff to clean the Reed B-30 Concrete Pump[.] . . . Plaintiff started cleaning the concrete pump, but something caught his hand and mangled it. When he pulled his hand out of the machine, he only saw his thumb.

17. At the hospital, Plaintiff was diagnosed with a severe crush injury to the right hand. He had fractures in the second, third, fourth, and fifth metacarpals. He underwent a hand re-plantation at the hospital. Following the surgery, Plaintiff did not receive timely physical therapy and his hand remained immobilized for an extended period of time.

. . . .

21. Plaintiff testified that he has been unable to work in any capacity due to his hand injury since the date of his accident. Plaintiff described the condition of his hand as "very bad" and stated that he had no movement in his fingers. The Deputy Commissioner noted on the record that Plaintiff's hand was disfigured by a large scar, his four fingers seemed not to be mobile, and there was some visible atrophy. Plaintiff's medical records reflect that he has been referred to a hand clinic. As of September 2009, Dr. Richard Meyer of Fort Washington, Maryland, indicated that Plaintiff had a severe injury that would require rehabilitation and that Plaintiff was "not fit for working duty."

Based upon these findings, the Commission concluded that, "[a]s a result of his compensable injury by accident to his hand, Plaintiff has been totally disabled since April 16, 2009, and he is entitled to temporary total disability benefits in the amount of $213.34 per week from April 16, 2009 and continuing until further Order of the Commission."

As the Commission noted, the parties "stipulated into evidence without need for further authentication or verification" various documents, including Plaintiff's medical records, and stated that its findings were "[b]ased upon the competent evidence of record," a body of information which would include the relevant medical records. As a result, Plaintiff's medical records may be appropriately considered in assessing the extent to which the record supports the Commission's conclusion that Plaintiff was entitled to temporary total disability benefits. Thus, in order to determine whether the Commission's findings with respect to the disability issue have adequate record support, our examination will include the contents of Plaintiff's medical records and similar documents.

On 16 April 2009, Dr. James Thompson, the surgeon who operated on Plaintiff after his injury, described Plaintiff's injury as a "near amputation injury." Beginning in May, 2009, Plaintiff sought treatment in Maryland. The medical records relating to Plaintiff's treatment in Maryland reflect that:

1. According to the medical records from 24 July 2009, Plaintiff has "no appreciable wrist motion" and the fractures of his fingers "do not appear to be radiographically healed." In addition, the medical notes state that, "for there to be any hope of [Plaintiff] regaining any finger or wrist motion[,] he needs to be started immediately on . . . physical therapy" and that "[h]is prognosis at this point despite aggressive treatment is poor for regaining any useful function of the right hand."

2. According to the medical records from August, 2009, Plaintiff has "virtually no motion of the fingers with significant pain on any attempted motion." In addition, the relevant records stated that "[t]he patient is going to do very poorly," that "I am not at all optimistic that we will get even a fair result," and that, "[a]t this time[,] [Plaintiff's] hand is basically a post." Finally, under the heading "Work Status," the 18 August 2009 medical records state that Plaintiff "is not capable of working."

4. According to Plaintiff's medical records for 1 September 2009, Plaintiff is "not capable of working" and "will . . . need multiple reconstructive procedures" and "long term treatment."

5. According to medical records from 29 September 2009, Plaintiff needs evaluation for hand surgery and is "obviously not fit for working duty."

In addition, Plaintiff stated, in responding to Defendants' interrogatories, that he had not been released to return to work. As a result, the record evidence tends to show, consistent with the Commission's findings, that Plaintiff suffered a near-amputation of his right hand that required hospitalization and surgery; that he was unable to work in any capacity as the result of his hand injury; that his treating physicians found that Plaintiff had little or no ability to move his right hand; that Plaintiff would require extensive treatment in order to have any hope of regaining the ability to use that appendage; and that his treating physicians believed that Plaintiff was not capable of working. As a result, we conclude that the record contains "medical evidence that [Plaintiff] is physically or mentally, as a consequence of the work related injury, incapable of work in any employment;" that the Commission's factual findings have adequate record support; and that the Commission's findings are sufficient to support its determination that Plaintiff was disabled under the first prong of the test set out in *Russell*.

In urging us to reach a different result, Defendants argue that Plaintiff did not present any evidence tending to show that he had made a reasonable search for other employment, that any attempt to return to work would be futile in light of preexisting conditions, or that any work available to Plaintiff would involve payment of a lower wage. However, given that Plaintiff had not been released to return to work at the time of the hearing held before Deputy Commissioner Gillen, any consideration of the specific types of work which Plaintiff might be qualified to perform was premature. In addition, the methods of proof delineated in *Russell* are stated in the disjunctive. Neither this Court nor the Supreme Court have ever held that a claimant is required to satisfy more than one prong of the *Russell* test, and we now hold that proof of disability under any one of the four prongs of the *Russell* test is sufficient to permit an award of disability benefits. As a result, we conclude that the fact that the record did not address issues relating to the reasonableness of any efforts that Plaintiff might have made to find other work or the types of work that were available to Plaintiff does not in any way undercut the Commission's disability determination.

We have reviewed Defendants' other challenges to the Commission's disability determination and find them equally unpersuasive. For example, we are unable to agree with Defendants that the opinion of Plaintiff's physician to the effect that Plaintiff is "obviously not fit for working duty" lacks clarity, particularly given that physician's additional determination that Plaintiff "is not capable of working." On the contrary, Plaintiff's injury was not obscure or esoteric in nature. Simply put, Plaintiff's right hand was crushed and nearly amputated to such an extent that, at the time of the Commission's decision, Plaintiff had not regained any use of his right hand. The causal relationship between Plaintiff's inability to use his right hand and his inability to work is clear. In addition, Defendants contend that "there is no evidence that Dr. Meyer had an understanding of [Plaintiff's] educational history, work history, or the job requirements of any potential positions of employment which may have been available" to Plaintiff. A claimant's treating physician is qualified to render an opinion as to the physical factors that limit the claimant's ability to work. In this case, based on the fact that Plaintiff had lost any effective ability to use his right hand, Dr. Meyer appropriately opined that Plaintiff was unable to work. We have never held, and decline to hold in this case, that a physician's opinion concerning a claimant's ability to work stemming from physical limitations must incorporate an analysis of the vocational opportunities available to that claimant. Moreover, the undisputed evidence shows that Plaintiff had no education beyond completing the sixth grade in El Salvador and that his work history in this country was limited to the performance of unskilled labor. For that reason, we believe that any consideration of Plaintiff's education and experience in the course of the disability determination would make a physician more likely, rather than less likely, to find Plaintiff disabled. As a result, the Commission did not err by concluding that Plaintiff was disabled.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that Plaintiff was employed by Rocha Masonry for purposes of the Workers' Compensation Act and that the Commission did not err by concluding that Plaintiff was temporarily totally disabled. As a result, the Commission's order should be, and hereby is, affirmed.

AFFIRMED.

Judges McGEE and McCULLOUGH concur.